# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**GEORGE M. PLEWS**
**JEFFREY D. CLAFLIN**
**JONATHAN P. EMENHISER**
Plews Shadley Racher & Braun LLP
Indianapolis, Indiana

**JON S. FALETTO**
Hinshaw & Culbertson LLP
Peoria, Illinois

ATTORNEYS FOR APPELLEE:

**RICHARD R. SKILES**
**JANET M. PRATHER**
Skiles DeTrude
Indianapolis, Indiana



FILED

Aug 28 2012, 8:54 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

FLM, LLC,                                             )
                                                      )
    Appellant-Plaintiff/Counterclaim Defendant, )
                                                      )
    and                                             )
                                                      )
DAIMLER CHRYSLER CORPORATION,                         )
n/k/a CHRYSLER LLC,                                   )
                                                      )
    Appellant-Third-Party Defendant/               )
    Counterclaimant,                               )
                                                      )
        vs.                                   )    No. 49A02-0902-CV-127
                                                      )
THE CINCINNATI INSURANCE COMPANY,                     )
                                                      )
    Appellee-Defendant/Third-Party Plaintiff/      )
    Counterclaimant/Counterclaim Defendant.        )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable David J. Dreyer, Judge
Cause No. 49D10-0501-PL-943

**August 28, 2012**

**OPINION - FOR PUBLICATION**

**KIRSCH, Judge**

This appeal concerns insurance coverage for claims arising from the abandonment of foundry sand from the Indianapolis foundry of Daimler Chrysler Corporation, n/k/a Chrysler LLC, ("Chrysler") by lessee International Recycling Inc. ("IRI") on lessor FLM, LLC's ("FLM") property and the migration of the sand onto adjacent property. FLM filed a complaint seeking a declaration that IRI has coverage under IRI's insurance policies with The Cincinnati Insurance Company ("Cincinnati") for the environmental liabilities asserted against FLM and for FLM's own action against IRI. Cincinnati filed a counterclaim, seeking a declaration that there was no coverage under the policy for the claims, and a third-party complaint for declaratory judgment that brought Chrysler into the case. Chrysler subsequently filed a counterclaim against Cincinnati for declaratory relief. The trial court granted summary judgment in favor of Cincinnati relating to the claims of FLM and Chrysler. FLM and Chrysler appeal raising several issues, of which we find the following dispositive: whether IRI's abandonment of sand constitutes a "wrongful entry" or "invasion of the right of private occupancy" covered by the "personal injury" provisions of the insurance policies

We reverse and remand with instructions.

### FACTS AND PROCEDURAL HISTORY[1]

FLM is an Indiana company that owns land located at 3515 East Washington Street in Indianapolis, Indiana ("FLM's Property"). On May 14, 1999, FLM leased the property to IRI, which planned to use FLM's Property for the storage, mixing, and removal of sand, gravel, and similar materials. Pursuant to the terms of its lease, IRI was

---

[1] Oral argument was heard on this case on February 29, 2012 in Indianapolis. We commend counsel on the quality of their written and oral advocacy.

required to "comply fully with all federal, state, and local environmental, health, or safety statutes, rules, regulations, or ordinances." *Appellants' App*. at 54. If IRI violated this provision, allowed the presence of hazardous material to contaminate FLM's Property, or if contamination occurred from which IRI was liable to FLM for damages, IRI was required to indemnify FLM against all claims, judgments, damages, penalties, fines, costs, liabilities, or losses resulting from such contamination. *Id*. at 54-55. The lease also contained another provision, where IRI agreed to indemnify FLM against all actions, claims, demands, costs, damages, or expenses of any kind that may be brought against FLM due to IRI's negligent performance or failing to perform its obligations under the lease. *Id*. at 53.

Chrysler owned and operated a foundry in Indianapolis, which generated large amounts of foundry sand. Chrysler entered into purchase order transactions with IRI for the collection, transportation, and beneficial reuse or other appropriate disposal of foundry sand generated from Chrysler's Indianapolis foundry. IRI began depositing foundry sand from Chrysler's facility onto FLM's Property in May 1999. Chrysler paid IRI for the removal of the foundry sand; IRI had only one customer and one source of revenue -- Chrysler.

The Indiana Department of Environmental Management ("IDEM") characterized the foundry sand stored on FLM's Property as Type III foundry sand. Type III sand may be used for certain purposes, including structural fill for roads, construction and architectural fill, and raw material in concrete, asphalt, and cement. IRI planned to mix the foundry sand with aggregate on FLM's Property and then to transport it from FLM's

Property to be used as structural backfill for building and roadway projects. IRI intended that the foundry sand would only remain on FLM's Property temporarily, which was consistent with IDEM guidelines for Type III foundry sand. IRI hired a consultant, Environmental Resources Management ("ERM") to ensure that IRI was complying with IDEM's guidelines. After its review, on June 10, 2002, ERM concluded that IRI was in compliance with such IDEM guidelines.

In the fall of 2002, Chrysler stopped paying IRI. As a result, IRI could no longer fund the removal of the foundry sand from FLM's Property. In March 2003, IRI stopped paying rent to FLM and abandoned over 100,000 tons of foundry sand on FLM's Property, where most remains to this day. In the fall of 2002, CSX Transportation, Inc. ("CSX"), which owned property adjacent to FLM's Property that was used to operate a railroad right-of-way, began complaining to IRI that foundry sand was migrating onto its property. The foundry sand had allegedly clogged drainage pipes, causing water to accumulate on CSX's property and interfering with train and signal operations.

Because of complaints it received about the foundry sand, IDEM investigated FLM's Property and observed surface and wind erosion. IDEM issued a Notice of Violation ("NOV") to IRI, FLM, and Chrysler on May 17, 2004 and ordered them to remove the foundry sand. On January 13, 2004, the City of Indianapolis ("the City") issued a Notice of Municipal Code Violation ("NOMCV") to FLM, which found that there had been a violation of the sediment control ordinance due to sand migration. As a result of this violation, the City ordered that sediment controls be installed and that the

4

sand be removed unless a drainage permit was obtained. FLM, in turn, sought indemnity under the lease from IRI.

Cincinnati insured IRI under a Commercial General Liability ("CGL") policy numbered CPP 071 11 07 ("the CGL Policy") from May 1, 1999 until March 14, 2003. The CGL Policy provided coverage for "Bodily Injury and Property Damage Liability" and "Personal and Advertising Injury Liability." *Appellants' App*. at 143, 146. The "Bodily Injury and Property Damage Liability" states:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.
>
> . . . .
>
> b. This insurance applies to "bodily injury" and "property damage" only if:
>
> > (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
> >
> > (2) The "bodily injury" or "property damage" occurs during the policy period.

*Id*. at 143. The CGL Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id*. at 153. The CGL Policy defines "property damage" as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

*Id*.

5

The "Personal and Advertising Injury Liability" coverage clause states:

> a.     We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies.

*Id*. at 146. The CGL Policy defined "personal injury" as "injury other than "bodily injury" arising out of one or more of the following offenses: . . . The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies by or on behalf of its owner, landlord, or lessor . . . ." *Id*. at 153.

Cincinnati also insured IRI under a Commercial Umbrella Liability policy numbered CCC 446 16 01 ("Umbrella Policy"). *Id*. at 243. The relevant portions of the Umbrella Policy state:

> We will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages in excess of the "underlying insurance" or for an "occurrence" covered by this policy which is either excluded or not covered by "underlying insurance" because of:
>
> > 1.     "Bodily injury" or "property damage" covered by this policy occurring during the policy period and caused by an "occurrence"; or
> >
> > 2.     "Personal injury" or "advertising injury" covered by this policy committed during this policy period and caused by an "occurrence."

*Id*. at 245. "Occurrence" is defined in the Umbrella Policy as:

> a.     An accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in "bodily injury" or "property damage."
>
> b.     An offense that results in "personal injury" or "advertising injury." All damages that arise from the same act, publication, or general conditions shall be deemed to arise from one "occurrence". . . .

*Id.* at 256. The definitions for "personal injury" and "property damage" in the Umbrella Policy are the same as those in the CGL Policy.

On January 10, 2005, FLM filed a complaint against Cincinnati seeking a declaration that IRI has coverage under the CGL Policy and the Umbrella Policy (collectively, "the Policies") for the environmental liabilities asserted by IDEM and the City, as well as FLM's own action against IRI arising from those claims.[2] On March 3, 2005, Cincinnati filed its answer and counterclaim, seeking a declaration that there was no coverage under the Policies for the claims. On May 12, 2005, Cincinnati filed a Third-party Complaint for Declaratory Judgment in order to bring Chrysler, IRI, IDEM, and the City as indispensable parties into the coverage action. On March 9, 2007, CSX filed a cross-complaint against IRI and FLM seeking trespass and nuisance damages related to the migration of foundry sand onto its property.

On December 3, 2007, Cincinnati filed a motion for partial summary judgment, requesting the trial court to declare that there was no coverage under the Policies for the claims made by IDEM, the City, FLM, or Chrysler against IRI. Cincinnati's motion specifically excluded the claims made by CSX. On February 11, 2008, FLM responded to Cincinnati's motion and filed a cross-motion for summary judgment to determine that there was coverage for these claims, including the claims made by CSX, under both the "Property Damage Liability" coverage and the "Personal Injury Liability" coverage in the

---

[2] Prior to filing that complaint, FLM had filed a complaint against IRI for, among other things, damages from IRI's activities on FLM's Property, indemnification against IDEM's, the City's, and CSX's claims against FLM, and trespass for leaving the foundry sand on FLM's Property. *Appellants' App.* at 1694-1707.

7

Policies. On March 3, 2008, Chrysler opposed Cincinnati's motion, joined FLM's cross-motion and filed its own cross-motion for summary judgment.

On November 6, 2008, the trial court granted partial summary judgment in favor of Cincinnati and denied FLM's and Chrysler's cross-motions for summary judgment. The trial court specifically stated:

> Summary judgment is GRANTED to Cincinnati as against any insurance coverage obligation, duty of defense, indemnification, or payment owed to or on behalf of IRI . . . relating to the claims made by IDEM, the City . . ., FLM and/or [Chrysler], but this grant does not extend to alleged coverage obligations stemming from claims by CSX.

> FLM's cross-motion for summary judgment is DENIED.

*Id*. at 37. The trial court also denied Chrysler's cross-motion for summary judgment as moot. FLM and Chrysler now appeal.[3] After oral argument in this case, Cincinnati informed us that it had settled with CSX.[4]

---

[3] Chrysler contends that, to the extent that CSX, FLM, and the other parties are holding it liable for the environmental violations and property damage caused by IRI, it is under a theory of vicarious liability for the acts or omissions of IRI in abandoning the sand. Because of the derivative nature of Chrysler's claims, it asserts it is seeking the same determinations of coverage from Cincinnati as FLM, and the "same interpretation of Cincinnati's policies is required for both FLM's and Chrysler's positions with regard to summary judgment in this case." *Appellant Chrysler's Br*. at 6. Therefore, we refer only to FLM's arguments when addressing the arguments of the appellants.

[4] In exchange for $300,000, CSX released Cincinnai, IRI, and others from liability for claims resulting from

> A) the presence of the pile of spent foundry sand located on land presently owned by FLM, LLC ("FLM") in Marion County, Indiana and/or B) foundry sand which was at one time deposited on land owned by FLM in Marion County, Indiana, (collectively, "the sand") and/or C) the sand's migration onto the adjacent CSX right-of-way.

*FLM, LLC v. The Cincinnati Ins. Co.*, No. 49A02-0902-CV-127 (Ind. Ct. App. May 23, 2012). In light of this settlement, it is not clear what cleanup costs actually remain. IDEM ordered the foundry sand to be completely removed. As was discussed at the oral argument in this case, cleaning up CSX's property will "very likely" require cleaning up FLM's property; otherwise, the sand would migrate back to CSX's property and cause more damage.

## DISCUSSION AND DECISION

On appeal from a grant of summary judgment, our standard of review is the same as that of the trial court. *Wilcox Mfg. Grp., Inc. v. Mktg. Servs. of Ind., Inc.,* 832 N.E.2d 559, 562 (Ind. Ct. App. 2005). We stand in the shoes of the trial court and apply a *de novo* standard of review. *Cox v. N. Ind. Pub. Serv. Co.*, 848 N.E.2d 690, 695 (Ind. Ct. App. 2006). Our review of a summary judgment motion is limited to those materials designated to the trial court. Ind. Trial Rule 56(H); *Robson v. Tex. E. Corp.,* 833 N.E.2d 461, 466 (Ind. Ct. App. 2005), *trans. denied.* Summary judgment is appropriate only where the designated evidence shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. T.R. 56(C). For summary judgment purposes, a fact is "material" if it bears on the ultimate resolution of relevant issues. *Wilcox Mfg.*, 832 N.E.2d at 562. We view the pleadings and designated materials in the light most favorable to the non-moving party. *Id.* Additionally, all facts and reasonable inferences from those facts are construed in favor of the nonmoving party. *Troxel Equip. Co. v. Limberlost Bancshares,* 833 N.E.2d 36, 40 (Ind. Ct. App. 2005), *trans. denied.*

A trial court's grant of summary judgment is clothed with a presumption of validity, and the party who lost in the trial court has the burden of demonstrating that the grant of summary judgment was erroneous. *Cox*, 848 N.E.2d at 695-96. Where a trial court enters specific findings and conclusions, they offer insight into the rationale for the trial court's judgment and facilitate appellate review, but are not binding upon this court. *Id*. We will affirm upon any theory or basis supported by the designated materials. *Id.*

9

When a trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having his or her day in court. *Id.*

In this case, the parties filed cross-motions for summary judgment. However, the fact that cross-motions for summary judgment were made does not alter our standard of review. *Mahan v. Am. Standard Ins. Co.*, 862 N.E.2d 669, 676 (Ind. Ct. App. 2007), *trans. denied*. "Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Id.*

The interpretation of an insurance policy is primarily a question of law and, therefore, is a question particularly suited for summary judgment. *Id*. (citing *Lake States Ins. Co. v. Tech Tools, Inc.,* 743 N.E.2d 314, 318 (Ind. Ct. App. 2001)). "Where there is an ambiguity, policies are to be construed strictly against the insurer." *Lake States Ins.*, 743 N.E.2d at 318. "An insurance contract is ambiguous when it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning." *Allstate Ins. Co. v. Bradtmueller,* 715 N.E.2d 993, 997 (Ind. Ct. App. 1999), *trans. denied.* An ambiguity does not exist, however, merely because the parties favor a different interpretation. *Mahan*, 862 N.E.2d at 676. Where terms are unambiguous, they should be given their plain and ordinary meaning. *Id.* (citing *Farmers Ins. Exch. v. Smith,* 757 N.E.2d 145, 149 (Ind. Ct. App. 2001), *trans. denied*). A court should construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Id.*

FLM argues that Cincinnati's personal injury coverage applies to its claims against IRI. FLM asserts that IRI wrongfully entered onto FLM's Property by not removing the foundry sand after IRI stopped paying rent and violated the environmental compliance requirements in the lease. Specifically, FLM contends that IRI's right to store foundry sand on FLM's Property was contingent on IRI paying rent and obeying all environmental laws, and once IRI breached its lease contract, FLM claims that it no longer had a right to keep sand on its property and, therefore, committed a wrongful entry. Further, FLM argues that IRI's failure to remove the foundry sand was an "invasion" of FLM's "right to private occupancy" because the "right to private occupancy" includes the right to property that is free of tons of foundry sand belonging to another entity and left on your property.

Under the Policies, Cincinnati was obligated to pay "those sums that the insured becomes legally obligated to pay as damages because of 'personal injury.'" *Appellants' App.* at 146. Personal injury is defined as: "injury other than "bodily injury" arising out of one or more of the following offenses: . . . The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies by or on behalf of its owner, landlord, or lessor . . . ." *Id.* at 153. Personal injury coverage does not require an "occurrence" or "property damage," but instead requires that injury arise from an enumerated "offense," which could be either a "wrongful entry" or an "invasion of the right of private occupancy." *Id.* at 153.

In *Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926 (Ind. Ct. App. 1999), our court found that the policy provisions at issue in that case must be construed to

11

cover the environmental damages alleged. *Id*. at 938. Summit was in the business of manufacturing and finishing metal parts and was ordered to clean up contaminants at various sites. *Id*. at 929. The claims against Summit involved contamination on land it owned, land owned by others to which Summit had sent waste, and groundwater contaminated at all those sites. *Id*. at 929-30, 937. A panel of this court interpreted policy language contained under personal injury coverage that was identical to the language in Cincinnati's policies and found the language to be ambiguous due to the variety of meanings available for the terms in the policy and the disagreement among other courts regarding whether damages caused by pollutants could be covered under personal injury provisions.[5] *Id*. at 937-38. This court therefore concluded that the personal injury provision at issue must be construed to cover the environmental damages of the suit. *Id*. at 938.

The reasoning underlying the *Summit* decision applies with equal force here.[6] Cincinnati's personal injury provision contained language identical to the language in the personal injury provision at issue in *Summit*, and just as the court in that case determined such language to be ambiguous, we likewise conclude that the language used in

---

[5] In *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1056-57 (Ind. 2001) ("*Dana II*"), our Supreme Court held that the terms "wrongful eviction" (on the facts of that case) and "invasion of the right of privacy" could not reasonably be construed to describe environmental contamination. The Court did not alter the ruling in *Summit* as to "wrongful entry" and did not address "invasion of the right of private occupancy." *Id*. at 1057.

[6] Cincinnati contends that the claims of FLM for indemnity for the actions by IDEM and the City do not implicate personal injury because the actions do not claim wrongful entry or invasion of the right of private occupancy of FLM's Property. *Summit* involved actions by the United States Environmental Protection Agency and other environmental agencies, ordering clean up of various sites. Therefore, because *Summit* is controlling here, the claims at issue in the present case are covered.

Cincinnati's policies is ambiguous. Because the Policies are ambiguous, we must construe the language against the insurer and in favor of coverage. *Id*. at 937.

FLM's allegations here involved sand initially brought onto property owned by FLM legitimately under the lease, but later abandoned by IRI when it could no longer pay its rent. The sand abandoned by IRI interferes with the right of FLM to use and enjoy its property. As a result of such interference, the language used in the Policies may be reasonably construed to cover the abandonment.

Cincinnati contends that, even if the abandoned sand's presence on FLM's Property constituted a wrongful entry or invasion of the right of private occupancy, the Policies' personal injury coverage is limited, in relevant part, to IRI's liability for: "The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies *by or on behalf of its owner, landlord, or lessor*." *Appellants' App*. at 153 (emphasis added). Cincinnati asserts that the italicized language limits the coverage to only a wrongful entry or invasion of the right of private occupancy that is *by or on behalf of its owner, landlord, or lessor*. Therefore, Cincinnati claims that, even if IRI's abandonment of the sand constituted a wrongful entry or invasion of the property, it was not committed by or on the behalf of the property's owner, landlord, or lessor, here FLM. Since it is undisputed that the IRI was the tenant of FLM's Property, Cincinnati asserts that no coverage was implicated.

Because this language was not considered in the *Summit* case, we must determine whether such language is ambiguous. Under Cincinnati's interpretation of the policy language, to qualify for coverage, either the wrongful entry or the invasion of the right to

13

private occupancy, which was the abandonment of sand by IRI, must have been committed by or on behalf of owner, landlord, or lessor, FLM. FLM argues that without the word "committed," it is unclear as to what the last clause "by or on behalf of its owner, landlord, or lessor" applies, and therefore ambiguity exists. FLM asserts that if Cincinnati meant to only cover wrongful entry or invasion when the entry was committed by or on behalf of the property's owner, landlord, or lessor, then it should have drafted its policy in such a manner, and that, at most, Cincinnati's interpretation of the of the Policies' language is only one interpretation of the language, which makes it ambiguous. We agree.[7]

"To get at the thought or meaning expressed in a statute, a contract, or a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them." *Lake Cnty. v. Rollins*, 130 U.S. 662, 670 (1889). *See also, Hamilton Cnty. Dep't of Pub. Welfare v. Smith,* 567 N.E.2d 165, 169 (Ind. Ct. App. 1991) ("In addition, where the meaning of a particular clause or phrase is in doubt, the court should examine the grammatical structure of the clause in order to ascertain its meaning."). As a matter of strict grammatical construction, the descriptive words in a phrase should, in the absence of punctuation, be referred to their nearest antecedent, and had the intent been, by means of punctuation, to bring out a meaning which would refer these qualifying words to more than their immediate antecedent, a comma should have been inserted after said word.

---

[7] We note that the Third Circuit, in *New Castle County, Delaware v. National Union Fire Insurance Co. of Pittsburgh*, 174 F.3d 338 (3d Cir. 1999), interpreted policy language identical to the language at issue in this case and determined that such language was ambiguous. Although that case is not binding on this court, we find its reasoning to be persuasive and instructive in the present case.

14

*First Nat'l Bank of Peoria v. Farmers' & Merchants' Nat'l Bank of Wabash*, 171 Ind. 323, 86 N.E. 417, 423 (1908).

Applying this rule of construction to the policy language at issue, it is clear that "by or on the behalf of" modifies "that a person occupies," the language that directly precedes it, and not the "wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy" language. On this basis, we find that a different interpretation from the one proposed by Cincinnati to be entirely reasonable. Because this language in the Policies is subject to more than one reasonable interpretation, it is ambiguous, and must be construed against Cincinnati and in favor of coverage.

We must next determine whether coverage is excluded because IRI incurred liability due to contractual assumption. Under the CGL Policy, the insurance does not apply to "personal injury": "For which the insured had assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement." *Appellants' App*. at 146. Although IRI did assume liability for damages and actions made against FLM due to IRI's negligent performance under the lease,[8] IRI was also a named party on the NOV issued by IDEM. Therefore, IRI may be held liable for the damages even in the absence of the contract or agreement, and the exclusion does not apply. The trial court erred in granting

_____

[8] Cincinnati argues that both FLM and Chrysler failed to demonstrate that their respective contracts required IRI to indemnify them against IDEM's and the City's claims. IRI's lease with FLM contained a provision, where IRI agreed to indemnify FLM against all actions, claims, demands, costs, damages, or expenses of any kind that may be brought against FLM due to IRI's negligent performance or failing to perform its obligations under the lease. *Appellants' App*. at 53. Clause 54 of incorporated terms in Chrysler's Purchasing General Terms and Conditions provided that IRI would assume all risk of damage to property or of bodily injury from any action, omission, or operation under the contract or in connection with the work. *Id*. at 2365-69. We therefore conclude that both FLM and Chrysler sufficiently demonstrated that IRI was required to indemnify them under their respective contracts.

summary judgment in favor of Cincinnati.  We therefore reverse the trial court's entry of

summary judgment in favor of Cincinnati and remand with instruction to enter summary

judgment in favor of FLM.

Reversed and remanded with instructions.

VAIDIK, J., concurs.

BRADFORD, J., concurs in result with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| FLM, LLC, ) | |
| ) | |
|    Appellant/Plaintiff/Counterclaim ) | |
|    Defendant, ) | |
| ) | |
|    and ) | |
| ) | |
| DAIMLER CHRYSLER CORPORATION, ) | |
| n/k/a CHRYSLER LLC, ) | |
| ) | |
|    Appellant/Third-Party Defendant/ ) | |
|    Counterclaimant, ) | |
| ) | |
|       vs. ) | No. 49A02-0902-CV-127 |
| ) | |
| THE CINCINNATI INSURANCE COMPANY, ) | |
| ) | |
|    Appellee/Defendant/Third-Party Plaintiff/ ) | |
|    Counterclaimant/Counterclaim Defendant. ) | |

**BRADFORD, Judge, concurring in result.**

Although I agree with the majority that there is coverage here, I reach my conclusion by another route. In my view, while the "personal injury" provisions of the Policies do not provide for coverage, the "property damage" provisions do. Consequently, I concur in result.

## I. Personal Injury Provisions

I agree with the majority's conclusion that the Policies' definition of "personal injury" is ambiguous to the extent that it is unclear just what the phrase "by or on behalf of its owner, landlord, or lessor" is modifying. I do not believe, however, that this ambiguity leads to coverage in this case, because there is no evidence that IRI ever did anything on FLM's behalf, much less any of the actions the phrase might be modifying. Even if we assume that the phrase is modifying "occupies," there is no indication that the relationship between FLM and IRI ever went beyond that of lessor and lessee, and as the Indiana Supreme Court has noted, "no agency is implied between lessor and lessee." *Hopkins v. Hudson*, 107 Ind. 191, 196, 8 N.E. 91, 93 (1886). The Indiana Supreme Court has made it clear that, while ambiguities will be strictly construed against the insurer, "for ambiguity to confer coverage, *the covered item must be somewhere within the circle of ambiguity*." *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1057 (Ind. 2001) (emphasis supplied). Here, the circle of ambiguity is not large enough to encompass IRI's actions, because there is no evidence that IRI ever did anything on FLM's behalf. I would therefore conclude that the personal injury provisions of the Policies do not provide for coverage.

## II. Property Damage Provisions

Because the majority has concluded that the Policies' personal injury provisions provide coverage, it does not reach the question of whether the property damage provisions do, as FLM has also argued. In my view, the property damage provisions at issue do provide for coverage. The key question to be answered is whether the

18

contamination of FLM's land caused by the foundry sand constituted an "occurrence" within the scope of the Policies, and I conclude that it did.

IRI's GCL policy with Cincinnati defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Appellant's App. p. 153. The Umbrella Policy defines "occurrence," in part, as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in 'bodily injury' or 'property damage.'" Appellant's App. p. 256. The parties' arguments focus on the meaning of the term "accident," which is defined in neither policy. The question is whether the term only covers IRI's action of placing the foundry sand on FLM's land or whether it also encompasses the unintended consequences of that action. Put another way, because IRI unquestionably intended to put the sand on FLM's property, if the term "accident" does not also encompass unintended consequences of that non-accidental action, the property damage provisions would provide no coverage. Conversely, coverage *would* exist if the term "accident" encompassed unintended consequences of intentional actions.

I believe that the Indiana Supreme Court's holding in *Auto-Owners Insurance Co. v. Harvey*, 842 N.E.2d 1279 (Ind. 2006), controls here. In *Harvey*, the issue was whether a policy provided coverage for the harm caused by the insured, Toby Gearheart, who pushed his girlfriend Brandy Harvey into the Wabash River, where she drowned. *Id.* at 1281. As here, the relevant policy provided coverage for an "occurrence," which that policy defined as "an accident that results in bodily injury or property damage and includes, as one occurrence, all conditions or all continuous or repeated exposure to

19

substantially the same general harmful conditions." *Harvey*, 842 N.E.2d at 1283. Also as here, the policy did not define "accident." *Id.* While it was undisputed that Geatheart's push was intentional, it was not clear whether he intended Brandy to die. *Id.* at 1284-85. The question, then, was whether the push was an "accident" under the policy, because, while it was unquestionably intentional, it possibly had unintended consequences.

The *Harvey* Court first noted that "Indiana case law has held that, 'in the context of insurance coverage, an accident means an unexpected happening without an intention or design.'" *Id.* at 1283 (citing *Terre Haute First Nat. v. Pac. Emp'rs Ins. Co.*, 634 N.E.2d 1336, 1338 (Ind. Ct. App. 1993); *Nat. Mut. Ins. Co. v. Eward*, 517 N.E.2d 95, 100 (Ind.Ct.App.1987)). The Court then resolved the issue as follows:

> In the present case, the policy states that Auto-Owners will pay for its insured's legal liability for "damages because of or arising out of bodily injury or property damage caused by an occurrence." Under the facts of this case, however, the meaning and application of this provision is unclear. The language used by Auto-Owners can reasonably be understood in two different ways, depending on whether "occurrence" means Gearheart's push or Brandy's drowning. The policy language does not require that the "occurrence" or "accident" be limited to the actions of the insured. The claimed damages clearly arise out of Brandy's death, and the coverage ambiguity thus is whether the death should be considered to have been caused by the event of Gearheart's pushing or by the event of Brandy's drowning. If the required "accident" refers to Gearheart's push, then it is undisputed that it did not occur unexpectedly or unintentionally. If it applies to Brandy's slip, fall, and drowning, however, it is not clear that the drowning was clearly unexpected and unintentional. It was obviously unexpected and unintentional from Brandy's perspective, and possibly so from Gearheart's point of view. We thus find the policy language ambiguous and must construe it against Auto-Owners, holding that the term "occurrence" applies to Brandy's slip, fall, and drowning, and not to Gearheart's push.

*Id.* at 1284-85.

I believe that the *Harvey* Court's analysis applies with equal force here, and would reach the same conclusion, *i.e.*, that "accident" refers not only to the volitional act of the insured but also any unintended consequences of that act. In this case, this interpretation leads to the conclusion that there is coverage pursuant to the property damage provisions of the Policies.[9] As in *Harvey*, the Policies do not require that the "accident" be an action of the insured, meaning that the policy here contains the same ambiguity as the policy in *Harvey*. In other words, "accident" could just as easily be referring to IRI's actions as to the unintended consequences of those actions, and this ambiguity must be resolved in favor of coverage. Because I believe that coverage exists here pursuant to the property damage provisions of the Policies, I would remand with instructions to enter summary judgment in favor of FLM on that basis.

---

[9] I note one procedural distinction with *Harvey*: in that case, there existed a genuine issue of material fact regarding whether Gearheart intended Brandy's death, so the Court remanded for trial on the issue. Here, there does not seem to be any designated evidence that IRI intended for the foundry sand to contaminate FLM's property. Therefore, in my view there would be no need for trial on the issue of coverage, as there was in *Harvey*.