**FOR PUBLICATION**



**FILED**

Dec 16 2014, 9:29 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**GEORGE M. PLEWS**
**SEAN M. HIRSCHTEN**
Plews Shadley Racher & Braun LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**STEPHEN J. PETERS**
**DAVID I. RUBIN**
Plunkett Cooney, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| THOMSON, INC. n/k/a TECHNICOLOR USA, INC., et al., | ) ) ) | |
| Appellants-Plaintiffs, | ) ) | |
| vs. | ) ) | No. 49A02-1401-PL-9 |
| XL INSURANCE AMERICA, INC. f/k/a WINTERTHUR INTERNATIONAL AMERICA INSURANCE COMPANY, et al., | ) ) ) ) ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Michael D. Keele, Judge
Cause No. 49D07-0807-PL-30746

**December 16, 2014**

**OPINION – FOR PUBLICATION**

**KIRSCH, Judge**

Thomson, Inc. n/k/a Technicolor USA, Inc. ("Thomson") appeals the trial court's order granting summary judgment in favor of XL Insurance America, Inc. f/k/a Winterthur International America Insurance Company ("XL") on Thomson's claim for insurance coverage. Thomson raises several issues on appeal, of which we find the following dispositive:

I.    Whether the trial court erred in granting summary judgment to XL because the trial court incorrectly concluded that the known loss doctrine prohibited Thomson from recovering under its primary or umbrella policies issued by XL as to the Taiwan site.

II.    Whether the trial court erred in granting summary judgment to XL because a material issue of fact exists as to whether Thomson knew about contamination at the particular area of the Circleville, Ohio site at issue.

We reverse and remand.

## FACTS AND PROCEDURAL HISTORY[1]

This appeal is part of an insurance coverage dispute between Thomson and many of its insurers. XL, one of the insurers, sold both primary and umbrella policies to Thomson covering 2000 through 2006. This particular case arises out of a dispute concerning insurance coverage between Thomson and XL for costs incurred by Thomson related to the investigation and cleanup of two environmentally contaminated sites, one in Taiwan and the other in Circleville, Ohio.

---

[1] On October 21, 2014, we held oral argument in this matter at Purdue University's Krannert Graduate School of Management. We extend many thanks. First, we thank counsel for the quality of the oral and written arguments, for participating in post-argument discussions with the audience, and for commuting from Indianapolis. We especially thank the Krannert Executive MBA Program for their accommodations and the students in the audience for their thoughtful post-argument questions.

**The Taiwan Plant**

In 1987, Thomson SA, a French company, acquired General Electric's ("GE") consumer electronics business, including a subsidiary called RCA Taiwan, Ltd. ("RCAT"). Among other things, RCAT operated a manufacturing plant ("the Taiwan Plant") in Taiwan. In 1989, RCAT changed its American name to Thomson Consumer Electronics Television Taiwan, Ltd. ("TCETV").

Throughout its history, the operations at the Taiwan Plant used a variety of solvents. Over the course of the years, chlorinated solvents—which are known human carcinogens— made their way into the soil and groundwater on site, and eventually began migrating into the groundwater flow beyond the site.

When Thomson SA acquired RCAT from GE in 1987, a baseline assessment was prepared to establish the extent of GE's liability for environmental contamination.[2] And indeed, the assessment established that chlorinated solvents had contaminated both the soil and groundwater as of February 1989. In 1992, TCETV reached out to local Taiwanese government officials and proposed connecting neighboring properties to the municipal water supply. Evidently, the government declined the offer, and the public was not notified of the contamination. Also in 1992, TCETV sold the Taiwan Plant to another corporation.[3]

---

[2] The parties had agreed that GE would assume all liability for contamination at the site as of the date of the sale.

[3] Litigation in France ensued when the entity that purchased the Taiwan Plant from TCETV alleged that Thomson failed to disclose the contamination as part of the sale.

On June 2, 1994, a Taiwanese legislator held a press conference to publicly accuse TCETV of contaminating the soil and groundwater at and around the Taiwan Plant. Following the press conference, the Director General of the Taiwan Environmental Protection Agency's ("TEPA") Bureau of Water Quality Protection demanded that TCETV develop a cleanup strategy. TEPA did not order TCETV to remediate the soil or groundwater because, at that time, there was no statute authorizing Taiwanese agencies to impose retroactive liability on former owners, such as TCETV, by compelling them to remediate.

On June 16, 1994, Thomson SA's risk manager notified CIGNA, its insurer at the time, that "Taiwan authorities inform[ed] us of the existence of toxic substances in the ground" at the Taiwan Plant and "are holding us responsible." *Appellee's App*. at 436. Thomson SA also expressed concern that, "these substances could have (or could have had) negative effects upon the health of our employees, to be seen in the neighborhood drawing water from wells in the proximity of" the Taiwan Plant. *Id*. The letter requested that an insurance claim be opened. On October 11, 1995, Thomson sent a claim declaration regarding "Taiwan Pollution" for "assumption of responsibility resulting from the discovery in Taiwan of toxic industrial waste contamination of a site formerly used by Thomson," bearing a date of claim of June 2, 1994. *Id*. at 438.

Notwithstanding the lack of a remediation order from TEPA, TCETV and GE began the remediation process and successfully remediated the soil. A TCETV employee explained why the company decided to proceed with remediation voluntarily:

4

> even if there wasn't a specific, definitive legal statute that [T]EPA . . . could point to to require the cleanup, there were other reasons to go ahead and proceed to make sure that the situation in Taiwan was handled appropriately; that being, one, to minimize down the road potential impact that could be caused by letting this situation continue to not be addressed, and . . . it's good corporate practice to . . . take care of situations before they get out of control so that you can minimize, in the long run, potential liability . . . to the entire Thomson group.

*Appellant's App*. at 149-50. In 1998, the soil remediation had been successful enough that TEPA issued a "No Further Action" letter to TCETV.

The groundwater contamination, however, was another issue altogether. TCETV and GE determined that groundwater remediation was neither required nor feasible. They proposed natural attenuation with monitoring to address that issue. TEPA did not order TCETV to remediate the groundwater, inasmuch as it lacked the authority to do so at that time.

In 2000, the Taiwanese legislature passed a new statute, the Soil and Groundwater Remediation Act. This law gave Taiwan's environmental authorities the power that they had lacked before -- the power to impose retroactive liability on entities that had caused contamination in the past and to require them to remediate that contamination. Additionally, the new law put in place new Class II groundwater standards. Pursuant to this law, in 2002, the Taoyuan County Environmental Protection Bureau ("TEPB") issued an order ("the TEPB Order") that required TCETV to remediate the groundwater to the newly-formulated Class II groundwater standards. TCETV has challenged the order

through the Taiwanese administrative process, but to avoid incurring fines, it has also complied with the order.

On July 8, 2008, TCETV notified XL of the TEPB Order. Between July 8, 2008, and October 9, 2012, when Thomson filed the motion for summary judgment at issue herein, TCETV incurred approximately $4.3 million in costs in remediating the groundwater at and around the site of the Taiwan Plant.

## Circleville, Ohio

In 1987, Thomson acquired a plant from GE that was located in Circleville, Ohio ("the Circleville Plant"). Thomson operated the Circleville Plant until it closed in 2004. The manufacturing process at the plant included the use of lead and industrial chemicals, and some contamination occurred at the site.[4]

On February 23, 1994, the Ohio Environmental Protection Agency ("OEPA") ordered Thomson and GE to investigate contamination at the site and develop a remediation plan ("the 1994 Consent Order"). No actual remediation was ordered, and none has been ordered to date. Thomson entered into the 1994 Consent Order, consented to OEPA's jurisdiction and power to enforce it, and agreed to the terms of the order. In 2011, OEPA issued an order requesting additional soil sampling from the raw materials handling area at the Circleville Plant, which was an area not previously included in the 1994 Consent Order. Thomson has incurred costs of approximately $25,000 during its investigation into the Circleville Plant contamination.

---

[4] Thomson was aware of the contamination issues when it purchased the plant from GE in 1987.

**The Litigation**

XL sold multiple insurance policies to Thomson beginning on January 1, 2000. Specifically at issue in this litigation are policies covering the years of 2000, 2001, and 2002. At some point, Thomson filed insurance claims for the costs it incurred in the remediation of the groundwater at the Taiwan Plant and in the investigation of the contamination at the Circleville Plant. XL denied coverage. On July 11, 2008, Thomson filed a complaint against XL and other insurers regarding the denial of coverage.[5]

On October 9, 2012, Thomson moved for summary judgment, arguing that, as a matter of law, XL owed Thomson defense and indemnity obligations for the Taiwan Plant remediation. On October 19, 2012, XL filed a cross-motion for summary judgment, arguing that, as a matter of law, it owed no defense or indemnity obligations to Thomson for either the Taiwan Plant or the Circleville Plant.

On December 12, 2013, the trial court granted summary judgment in favor of XL and denied Thomson's motion for summary judgment. The trial court found that the known loss doctrine precluded Thomson from its sought-after recovery under both the primary and umbrella policies as to the Taiwan Plant. The trial court applied the same rationale to the claims related to the Circleville Plant and held that a known loss precluded coverage under XL's policies. Thomson now appeals.

---

[5] The complaint is not contained in the record on appeal.

**DISCUSSION AND DECISION**

Thomson argues that the trial court erred by granting summary judgment in favor of XL and by denying Thomson's motion for summary judgment. When reviewing the denial of summary judgment, our standard of review is the same as that of the trial court. *Old Utica Sch. Pres., Inc. v. Utica Twp.*, 7 N.E.3d 327, 330 (Ind. Ct. App. 2014) (citing *Wellpoint, Inc. v. Nat'l Union Fire Ins. Co.,* 952 N.E.2d 254, 258 (Ind. Ct. App. 2011), *trans. denied*), *trans. denied*. We stand in the shoes of the trial court and apply a *de novo* standard of review. *Id*. (citing *FLM, LLC v. Cincinnati Ins. Co.,* 973 N.E.2d 1167, 1173 (Ind. Ct. App. 2012), *trans. denied*). Our review of a summary judgment motion is limited to those materials designated to the trial court. Ind. Trial Rule 56(H); *FLM*, 973 N.E.2d at 1173. Summary judgment is appropriate only where the designated evidence shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. T.R. 56(C). For summary judgment purposes, a fact is "material" if it bears on the ultimate resolution of relevant issues. *FLM,* 973 N.E.2d at 1173. We view the pleadings and designated materials in the light most favorable to the non-moving party. *Id.* Additionally, all facts and reasonable inferences from those facts are construed in favor of the nonmoving party. *Id.* (citing *Troxel Equip. Co. v. Limberlost Bancshares,* 833 N.E.2d 36, 40 (Ind. Ct. App. 2005), *trans. denied*).

A trial court's grant of summary judgment is clothed with a presumption of validity, and the party who lost in the trial court has the burden of demonstrating that the grant of summary judgment was erroneous. *Id.* Where a trial court enters specific findings and

conclusions, they offer insight into the rationale for the trial court's judgment and facilitate appellate review, but are not binding upon this court. *Id.* We will affirm upon any theory or basis supported by the designated materials. *Id.* When a trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having his or her day in court. *Id.*

In this case, the parties filed cross-motions for summary judgment. However, the fact that cross-motions for summary judgment were made does not alter our standard of review. *Mahan v. Am. Standard Ins. Co.,* 862 N.E.2d 669, 676 (Ind. Ct. App. 2007), *trans. denied.* "Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Id.*

## I. The Taiwan Plant

Thomson contends that the trial court erred in granting summary judgment to XL because the trial court incorrectly concluded that the known loss doctrine prohibited it from recovering under its primary or umbrella policies issued by XL as to the Taiwan Plant. The known loss doctrine was recently explored by this court in another appeal (from separate, unrelated litigation) involving Thomson and the Taiwan Plant:

> "The 'known loss' doctrine is a common law concept deriving from the fundamental requirement in insurance law that the loss be fortuitous. Simply put, the known loss doctrine states that one may not obtain insurance for a loss that has already taken place." *Gen. Housewares Corp.[v. Nat'l Sur. Corp.],* 741 N.E.2d [408,] 413 [(Ind. Ct. App. 2000)]. "[T]he known loss doctrine is not so much an exception, limitation, or exclusion as it is a principle intrinsic to the very concept of insurance." *Id.* at 415. "[I]f an insured has actual knowledge that a loss has occurred, is occurring, or is substantially certain to occur on or before the effective date of the policy, the known loss doctrine will bar coverage." *Id.* at 414. Whether an insured had

9

actual knowledge is ordinarily a question of fact. *Id.* at 413-14. "[W]hen determining a party's actual knowledge, courts should keep in mind that a party may not intentionally turn a blind eye in order to avoid application of the known loss doctrine." *Id.* at 413 n.3. "[B]ecause the effect of the known loss doctrine is to avoid coverage, the burden of proving that the loss was known is on the party seeking to avoid coverage." *Id.* at 414.

"[T]here is a distinct difference between knowledge of the existence of liability and knowledge of the full extent of liability." *Id.* at 416.

> The existence of liability can be known without the full extent of liability being fixed. For example, if one negligently injures a pedestrian with one's automobile, one's liability is substantially certain. However, it may be months before the dollar amount of liability is certain, and the known loss doctrine bars purchasing insurance after the accident. An insured's liability need not be fixed to a monetary certainty; if the known liability has occurred or is substantially certain to occur, the known loss doctrine bars coverage.

*Id.* at 417.

*Thomson, Inc. v. Ins. Co. of N. Am.*, 11 N.E.3d 982, 998-99 (Ind. Ct. App. 2014), *trans. pending*.

With respect to the Taiwan Plant, Thomson argues that the known loss doctrine does not apply because the doctrine "only bars coverage when a policyholder knows of *liability*, not of conditions that *might* -- if the law were different -- lead to liability." *Appellant's Br.* at 12 (emphasis in original). Specifically, Thomson emphasizes that when it purchased the insurance policies at issue herein, the Taiwanese government was without authority to mandate remediation. Therefore, Thomson asserts that, "[w]ithout a prior legal obligation, there was no 'known loss' when the XL 2000-2002 . . . policies were purchased. The 2002 [T]EPB Order, and the statute which created the new authority to order the groundwater

10

cleanup pursued since 2002, *did not exist* until after XL had sold Thomson all the 2000 to 2002 policies." *Id.* (emphasis in original).

In *General Housewares*, 741 N.E.2d 408, this court was called upon to determine the application of the known loss doctrine in Indiana insurance law. We said that, because the known loss doctrine was derived "from the fundamental requirement in insurance law that a loss be fortuitous," it applies where "an insured has *actual knowledge that a loss* has occurred, is occurring, or *is substantially certain to occur* on or before the effective date of the policy, the known loss doctrine will bar coverage." *Id.* at 413, 414 (emphasis added). This court was careful to distinguish between the "substantial certainty" test that it adopted and the "substantial probability" test that a minority of other jurisdictions uses:

> The term "probability" indicates the presence of contingency and fortuity, the lack of which is the very essence of the known loss doctrine. Even if there is a probability of loss, there is some risk, and the known loss doctrine should not apply.

*Id*. at 414. When determining "loss," the court held that a loss for purposes of the known loss doctrine is not the underlying injury, but instead, the *liability* for that underlying injury. *Id*. at 416.

In the present case, the application of the known loss doctrine requires a determination of what constituted the loss and when Thomson had actual knowledge of it. The trial court, in finding that the known loss doctrine barred coverage, confused the environmental contamination of the Taiwan Plant with the legal liability to remediate it. To be sure, Thomson had actual knowledge of the contamination of the soil and groundwater on the Taiwan Plant long before January 1, 2000 when the first XL policies

11

became effective. Were it seeking coverage as result of such contamination, it would be barred by the known loss doctrine.

However, Thomson is not seeking coverage for the environmental contamination to the Taiwan Plant. Rather, it is seeking coverage for the legal liability to remediate that contamination. That liability did not exist until the legislature in Taiwan enacted the legislation providing for retroactive liability for remediating environmental contamination in 2000. Prior to such enactment, Thomson could not have had actual knowledge of such liability or known that it was substantially certain to occur.

Indiana requires actual knowledge of the known loss. *Gen. Housewares*, 741 N.E.2d at 414. Therefore, it is irrelevant whether Thomson or others predicted the legislative enactment, whether it considered such enactment possible or even likely, or whether certain legislators publicly complained about the contamination and called for legislation to remediate it. Legislative enactments and the losses that result from them are fortuitous events that cannot be known until the day of enactment. Until the legislation was enacted, there was no liability, only the potential for such liability. Such a potential may constitute a known risk, but not a known loss.

In *Rohm & Haas Co. v. Continental Casualty Co.*, 781 A.2d 1172 (Pa. 2001), the Pennsylvania Supreme Court held that the known loss doctrine applies if an insured was aware or should have been aware of likely future losses. *Id*. at 1177. Language such as "likely to occur" or "should have been aware" is too subjective a standard on which to base insurance coverage. Should an insured homeowner in a tornado region in the mid-western

United States be denied coverage when his home is destroyed by a tornado on the basis that it was likely to occur and he should have been aware of the risk? Insurers are in the business of assessing risks and generally have a level of knowledge regarding insured risks equal to or greater than that of the insured; where they do not, they have the ability to remedy the disparity before issuing a policy.

We conclude that based on the evidence, Thomson did not have actual knowledge of its retroactive liability for remediating environmental contamination until after the effective dates of the policies purchased from XL. Therefore, the known loss doctrine did not preclude coverage for Thomson's remediation costs under both XL's primary and umbrella policies. The trial court erred in granting summary judgment in favor of XL and in denying Thomson's summary judgment motion as to the applicability of the known loss doctrine.

## II.  The Circleville Plant

In the 1994 Consent Order, Thomson agreed to investigate potential contamination and to implement any remedial actions that OEPA might order in the future. In 2011, OEPA issued another order that requested additional soil sampling from the raw materials handling area of the Circleville Plant. The raw materials handling area was not previously included in the 1994 Consent Order. The trial court found that the known loss doctrine barred coverage for the environmental cleanup of the Circleville Plant and granted summary judgment to XL.

As noted previously, in order for the known loss doctrine to bar coverage, an insured

13

must have actual knowledge that a loss has occurred, is occurring, or is substantially certain to occur on or before the effective date of the policy. *Gen. Housewares*, 741 N.E.2d at 414. Summary judgment is not appropriate if a genuine issue of material fact exists. T.R. 56(C). At trial, XL had the burden of demonstrating that Thomson had actual knowledge of a loss regarding the raw materials handling area prior to the purchase of XL's policies. *Gen. Housewares*, 741 N.E.2d at 414.

Although the trial court found that the 1994 Consent Order governed the entire Circleville Plant, the designated evidence did not show that the raw materials handling area was subject to the 1994 Consent Order. Tom Sipher, who had overseen Thomson's participation in the investigation and remediation of the Circleville Plant since 2004, stated in an affidavit that the raw materials handling area had not previously been subject to investigation and remediation. *Appellant's App*. at 406-07. Although several lagoons and the hazardous waste building are discussed as areas where contamination was found, nowhere in the 1994 Consent Order is the raw materials handling area mentioned. *Id*. at 412-20. Additionally, the 2011 OEPA order requiring the soil sampling of the raw materials handling area specifically stated that, "[b]ecause the raw materials handling area was then part of the glass manufacturing operation, this area was not included" in the 1994 Consent Order or "as a potential exposure area as part of the human health risk assessment." *Id*. at 408.

Based on the evidence, we conclude that a material issue of fact exists as to whether Thomson had actual knowledge of its liability as to contamination at the raw materials

handling area prior to the purchase of XL's policies. Because a material issue of genuine fact exists, summary judgment was not proper, and the trial court erred in granting XL's motion as to the Circleville Plant. We, therefore, reverse the trial court's grant of summary judgment in favor of XL and remand for further proceedings.

Reversed and remanded.

ROBB, J., concurs.

BAKER, J., dissents with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

THOMSON INC. n/k/a                          )
TECHNICOLOR USA INC. et al.,                )
                                            )
    Appellants-Plaintiffs,                  )
                                            )
       vs.                                 )     No.  49A02-1401-PL-9
                                            )
XL INSURANCE AMERICA, INC. f/k/a            )
WINTERTHUR INTERNATIONAL                    )
AMERICA INSURANCE COMPANY,                  )
                                            )
    Appellee-Defendant.                     )

**BAKER, Judge, dissenting.**

I respectfully dissent.  I believe that the known loss doctrine prohibits Thomson from recovering its damages stemming from both the Taiwan and Ohio sites.

Underlying the known loss doctrine is a well-established and prudent principle that "a party may not intentionally turn a blind eye in order to avoid application of the known loss doctrine." Gen. Housewares, 741 N.E.2d at 414 n.3.  In other words, the application of this doctrine—or the declination to apply it—should not encourage would-be insureds to bury their heads in the proverbial sand.  That would be bad public policy, indeed.

In this case, with respect to the Taiwan site, the record establishes that Thomson has been aware of the environmental contamination at the Taiwan site since 1989.  And in

voluntarily working to remediate the contamination, Thomson "ha[s] conducted [itself] in every sense like [an entity] accepting liability for the consequences of [its] actions. These are precisely the sort of known losses which the principle of fortuity and the common law doctrine that derives from it preclude would-be insureds from foisting on unsuspecting carriers." Appellee's Br. p. 18. Further evidence of the acceptance of the liability is the 1994 letter from Thomson SA to CIGNA, its insurer at the time, explaining that there had been contamination at the Taiwan site and that "Taiwanese authorities . . . are holding us responsible." Appellee's App. p. 436. Additionally, Thomson sent a letter to CIGNA in 1995 making a claim that was dated June 2, 1994, regarding "Taiwan pollution." Id. at 438.

In other words, Thomson knew that the ground was contaminated. Thomson knew that the Taiwanese government was understandably unhappy with the situation. Thomson knew that the government held Thomson responsible for the contamination. And while Thomson received a No Further Action letter from Taiwan regarding the soil remediation, Thomson knew that the Taiwanese government was dissatisfied with its lack of effort regarding remediation of the groundwater contamination. Although it is true that the Taiwanese government lacked the authority to enforce its cleanup demands until 2000, Thomson was well aware of the underlying issues long before the statute and EPB Order were issued.[6] To hold that Thomson did not "know" of this "loss" when it entered into the

---

[6] Moreover, the record establishes that the sole motivator for the adoption of the 2000 statute was Thomson's failure to remediate the contamination in a way that satisfied the Taiwanese government. To find in Thomson's favor would permit a policyholder to benefit from its own wrongful conduct. In XL's words, "Policyholders would receive more insurance coverage by defying existing laws and orders, forcing

insurance policies at issue would be to turn the known loss doctrine on its head and to encourage would-be insureds to put on their blinders with superglue. I believe that such a result would be poor public policy. Therefore, I would find that the trial court properly granted summary judgment in favor of XL with respect to the primary policies related to the Taiwan site.

Likewise, I believe that Thomson should not be able to recover under its excess insurance policies. Thomson directs our attention to authority providing that with respect to excess policies, a policyholder must know that a liability will reach the excess layers before coverage is barred under the known loss doctrine. See HSB Group, Inc. v. SVB Underwriting, Ltd., 664 F. Supp. 2d 158, 184 (D. Conn. 2009).

I do not believe that authority is applicable to the instant case. In General Housewares, this Court found that application of the known loss doctrine was dependent upon knowledge of the existence of liability rather than the extent of it, and the Court did not distinguish between different types of policies in applying this general rule. 741 N.E.2d at 415-16. To find that application of the known loss doctrine to umbrella insurance policies requires knowledge of the extent of liability would be to turn the General Housewares principle on its head. Furthermore, I agree with XL that "[i]f Thomson and TCETV can obtain coverage under the XL Umbrella Policies for a known loss that is not covered under the XL Primary Policies then Indiana's known loss doctrine becomes

---

the government to enact stricter measures which can then be characterized as a 'different clean-up,' and then passing those costs to their insurers. That argument would create bad public policy and law." Appellee's Br. p. 30.

meaningless." Appellee's Br. p. 39. Consequently, I would find that the trial court did not err by granting summary judgment in favor of XL with respect to the umbrella policies related to the Taiwan site.

I would reach the same result with respect to the Circleville site. In the 1994 Consent Order, Thomson agreed to investigate potential contamination and to implement any remedial actions that OEPA might order in the future. By entering into this order, Thomson accepted responsibility for contamination at this site, and its arguments to the contrary relate to the extent, rather than the existence, of the liability. See Gen. Housewares, 741 N.E.2d at 417 (holding that "[a]n insured's liability need not be fixed to a monetary certainty; if the known liability has occurred or is substantially certain to occur, the known loss doctrine bars coverage").

The 2011 order does not change this result, inasmuch as the 1994 Consent Order relates to the entirety of the site. In other words, contamination of the raw materials handling area is still contamination at the Circleville Site, which is already governed by the 1994 Consent Order. Thomson knew of the potential contamination at this site in 1994 and agreed to investigate it and remediate it, if necessary. It cannot now claim that it did not "know" of the potential "loss" related to the contamination. I would find, therefore, that the trial court did not err by granting summary judgment in XL's favor with respect to the Circleville site.