

**FILED**
May 16 2017, 10:47 am
**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

George M. Plews
Jonathan P. Emenhiser
Plews Shadley Racher & Braun LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Donald E. Morgan
Melissa Hayden Kramer
Office of Corporation Counsel
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| FLM, LLC,<br>*Appellant-Defendant,*<br><br>v.<br><br>Metropolitan Development<br>Commission of Marion County,<br>Indiana,<br>*Appellee-Plaintiff* | May 16, 2017<br><br>Court of Appeals Case No.<br>49A02-1609-OV-2216<br><br>Appeal from the Marion Superior<br>Court<br><br>The Honorable Cynthia J. Ayers,<br>Judge<br><br>Trial Court Cause No.<br>49D04-1308-OV-31452 |

**Baker, Judge.**

[1] This case has been here before, in a different guise, on multiple occasions. FLM, LLC (FLM), leased property to International Recycling, Inc. (IRI). IRI proceeded to amass a veritable mountain of over 100,000 tons of sand on the property, in violation of multiple ordinances, and then went out of business and abandoned the sand. The mountain of sand is over fifty feet high, covers two acres, and is leaching multiple toxic chemicals into the ground beneath it. It has been looming over neighboring properties, polluting the City of Indianapolis, and violating multiple ordinances *for over fourteen years*. We are concerned, as the citizens of Indianapolis should be, that it took the City so long to step in more forcefully and that, despite winning a nearly $2 million judgment from IRI's insurer, FLM has not done what needs to be done to remedy the situation.

[2] The Metropolitan Development Commission of Marion County, Indiana (the City), eventually filed a claim against FLM in an attempt to require FLM to abate the ordinance violations on the property. FLM and the City filed cross-motions for summary judgment, and the trial court granted summary judgment in favor of the City. FLM now appeals, arguing that it did not cause, suffer, or allow its tenant's ordinance violations and should not, therefore, be held liable for them. It also contends that the City is empowered to enter the property and abate the violations for itself. Finding that FLM allowed the violations, we affirm and remand.

# Facts[1]

## *The Creation of Black Mountain*

[3] FLM owns a property located at 3515 East Washington Street in Indianapolis (the Property). On May 14, 1999, IRI leased the Property from FLM. Pursuant to the Lease, IRI was permitted to use the Property for the "storage, mixing and removal" of sand. Appellant's App. Vol. III p. 175. The Lease required IRI to "comply fully with all federal, state and local environmental, health or safety statutes, rules, regulations, or ordinances." *Id.* at 179.

[4] At some point, IRI entered into an agreement with Daimler Chrysler Corporation (Chrysler), pursuant to which IRI collected and transported foundry sand from Chrysler's foundry to the Property. The Chrysler Agreement provided that Chrysler paid IRI to remove the sand and that IRI was required to find beneficial reuses or other appropriate disposal for the sand.

[5] After executing the Lease with FLM, IRI began depositing Chrysler's foundry sand onto the Property. Its right to do so was contingent on IRI's compliance with the Lease. For a period of time, IRI mixed the foundry sand with aggregate and then removed it from the Property for use as structural backfill for construction projects, but at some point, IRI stopped removing the sand from the Property. FLM did not authorize IRI to store the sand permanently

---

[1] We held oral argument in this cause in Indianapolis on May 2, 2017. We thank counsel for their excellent oral and written presentations.

on the Property. In June 2002, an environmental consultant reported that IRI was in compliance with applicable environmental guidelines.

[6]     At some point, the stored foundry sand reached 105,000 tons—the "Black Mountain" it is known as today. *Id.* at 142. It is undisputed that Black Mountain surpassed twenty feet in height, was stockpiled without a required drainage permit, and altered the land in a manner that does not conform to existing topography. *Id.* at 186, 189.

[7]     In the fall of 2002, Chrysler—IRI's only customer and only source of revenue—stopped paying IRI. Once Chrysler stopped paying IRI, IRI could no longer continue its operations or remove the foundry sand from the Property. It stopped paying rent to FLM, abandoned the foundry sand on the Property, and eventually ceased all operations.

[8]     Around the time that Chrysler stopped paying IRI, the Indiana Department of Environmental Management (IDEM) began receiving complaints about Black Mountain; for example, one neighboring property owner complained that the sand was migrating onto its property and clogging drainage pipes. On May 17, 2004, IDEM issued a notice of violation to FLM and IRI and ordered them to remove the foundry sand.

[9]     By early 2004, the City had also learned of Black Mountain. In January 2004, the City issued a notice of municipal code violation under a sediment control ordinance, ordering FLM either to comply with drainage requirements or to remove the foundry sand.

### *The Pursuit of Insurance Proceeds and Cost of Removal*

[10]    After FLM received notices of violations from IDEM and the City, including orders to remove Black Mountain, FLM sought indemnification from IRI and IRI's insurer for the substantial amount of money it would cost to remove the sand from the Property. That litigation occupied the better part of the next decade, reaching this Court twice. *See FLM, LLC v. Cincinnati Ins. Co.*, 24 N.E.3d 444 (Ind. Ct. App. 2014), *on reh'g*, 27 N.E.3d 1141 (Ind. Ct. App. 2015), *trans. denied*; *FLM, LLC v. Cincinnati Ins. Co.*, 973 N.E.2d 1167 (Ind. Ct. App. 2012), *trans. denied*.

[11]    On July 16, 2013, the trial court overseeing the insurance litigation released to FLM $1.7 million in damages.[2] FLM recouped a portion of the award for its own damages, including funds for lost rent (totaling $495,000), attorney fees (totaling $686,741), and environmental consultant fees (totaling $9,243.50).

[12]    FLM has done extensive research into the cost of removal of Black Mountain. It has learned the following:

- If contractors and/or projects willing to take the sand for reuse could be found, the removal would cost approximately $1.2 million. Despite intensive efforts, FLM has been unable to locate anyone willing to take the sand for reuse.

---

[2] The insurer has since paid $750,000 more in insurance coverage into the trial court, but those funds have not yet been released to FLM.

- Removal by disposal in a landfill will cost at least $2.3 million. This cost would require a commitment to dispose of all the sand—and pay the full $2.3 million—at once.
- Load-by-load removal of the sand would cost over $3.5 million.

After recouping its own fees, FLM does not have sufficient funds to dispose of all the sand at a landfill or to remove it on a load-by-load basis.

### *The City Files a Lawsuit*

[13] On August 19, 2013, the City filed a complaint against FLM, alleging that FLM had violated an ordinance by causing, suffering, or allowing Black Mountain to remain on the Property and that Black Mountain exceeded twenty feet in height. On June 30, 2014, the City filed an amended complaint, adding two counts alleging that Black Mountain altered the land without required drainage permits and that Black Mountain altered the land in a manner that does not conform to the existing topography. FLM denied the allegations and raised as an affirmative defense the fact that the City had failed to join Chrysler and IRI, which FLM alleges are necessary parties to the litigation.

[14] On August 13, 2015, FLM filed a motion for summary judgment, asking the trial court to find as a matter of law that FLM did not cause, suffer, or allow the alleged ordinance violations. On November 13, 2015, the City filed a cross-motion for summary judgment, contending that it was entitled to judgment as a matter of law. Following briefing and a hearing, on May 23, 2016, the trial court entered judgment in favor of the City. In pertinent part, it found and held as follows:

5.  On May 14, 1999, [FLM] allowed [IRI] to store spent foundry sands on the Real Estate pursuant to a certain lease agreement, for which [FLM] received compensation.

\*\*\*

7.  IRI, with FLM's consent, began depositing foundry sand from Chrysler's facility onto the Real Estate on or after May 14, 1999.

\*\*\*

9.  IRI stopped paying rent under the lease agreement with [FLM] and abandoned approximately 100,000 tons of foundry sand on the Real Estate.

10.  The foundry sand . . . has a vertical height in excess of twenty (20) feet . . . .

11.  The placement of the foundry sand on the Real Estate constituted a land alternation [sic] for which a drainage permit is required . . . .

12.  FLM did not obtain a drainage permit for the placement of the foundry sand on the Real Estate . . . .

13.  The placement of the foundry sand on the Real Estate altered the land in a manner that does not conform to existing topography . . . .

14.  The abandonment of the foundry sand on the Real Estate caused significant concerns for adjacent property owners, the [IDEM], and the [City].

15. FLM has not removed the foundry sand from the Real Estate.

16. The foundry sand remains on the Real Estate in violation of the Revised Code [of Indianapolis and Marion County].

Appellant's App. Vol. II p. 20-21. The trial court ordered FLM to bring the Property into full compliance with City ordinances and to pay a fine of $500. FLM now appeals.

# Discussion and Decision

# I. Standard of Review

Our standard of review on summary judgment is well established:

> We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp,* 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (internal citations omitted).

*Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014).

## II. The Ordinances

There are three specific ways in which Black Mountain undeniably violates City ordinances:

(1)     Revised Code section 561-221[3] provides that "it shall be unlawful for a person, partnership or corporation to undertake or accomplish any land alteration without having in force a written drainage permit obtained from the bureau of license and permit services."

(2)     Revised Code section 561-382 seeks to control erosion by prohibiting land alterations and fill operations that do not conform with existing topography.

(3)     Revised Code section 733-209(a)(1) prohibits stored equipment and materials from exceeding twenty feet in height.

It is undisputed that Black Mountain does, in fact, violate the above ordinances. Although FLM did not actually commit any violations of the above ordinances, the City alleges that FLM is responsible for the cleanup of Black Mountain because of Revised Code section 730-505(a), which provides as follows:

> It shall be unlawful for any person who is the owner or contract vendee of, or who has a possessory interest in, real property located in Marion County *to cause, suffer or allow* any of the following civil zoning violations to occur on such property:

---

[3] We refer to the Revised Code provisions as codified in August 2013, when this litigation began.

***

> (8)     Failure to comply with zoning district development
>          standards . . . .

(Emphasis added).  The crux of this appeal, therefore, is whether, as a matter of

law, FLM caused, suffered, or allowed Black Mountain's ordinance violations.

# A.  Cause, Suffer, Allow

[17]     Ordinances are treated as if they stand on the same footing as an act of the

legislature; therefore, the rules applying to statutory construction apply equally

to ordinances.  *Lutz v. City of Indianapolis*, 820 N.E.2d 766, 770 (Ind. Ct. App.

2005).  The primary rule of statutory construction is to ascertain and give effect

to the intent of the drafters, and the plain language of the statute (or ordinance)

is the best evidence of the drafters' intent.  *Id.*  All words must be given their

plain and ordinary meaning unless otherwise indicated.  *City of Indianapolis v.

Campbell*, 792 N.E.2d 620, 624 (Ind. Ct. App. 2003).

[18]     FLM argues that, as a matter of law, it did not cause, suffer, or allow the

ordinance violations.  As these terms are not defined in the ordinances, we turn

to dictionaries for their plain and ordinary meanings.  *See Hendricks Cty. Bank &

Trust v. Guthrie Bldg. Materials, Inc.*, 663 N.E.2d 1180, 1186 (Ind. Ct. App. 1996)

(noting that courts properly consult dictionaries to determine the plain and

ordinary meaning of words in a statute).

- "Cause" means "[t]o bring about or effect."  *Black's Law Dictionary* 213
  (7th ed. 1999).

- "Suffer," in this context, means "[t]o allow or permit." *Id.* at 1446.
- "Allow" means to "permit," or "to fail to restrain or prevent." *Merriam-Webster Online Dictionary*, at http://www.merriam-webster.com/dictionary/allow (last visited May 3, 2017).

According to FLM, "[t]hese terms all require action which constitutes support or affirmatively assists an action." Appellant's Br. p. 31. We disagree. To "suffer" or "allow" something to occur can be entirely passive; no action is required. Indeed, the definition of "allow" quoted above is framed entirely as a *lack* of action—the failure to restrain or prevent an event from occurring. Therefore, we decline to frame our analysis in this manner.

[19] There are two relevant periods of time we must consider as we evaluate the situation. First, we must look at the period of time between 1999—when the lease was signed—and 2004—when IDEM and the City both issued notices of violations to FLM and IRI. Second, we must look at the period of time from 2004—at which time FLM undisputedly had actual knowledge of Black Mountain—to the present day.

# 1. 1999-2004

[20] Initially, we note that FLM's owner and sole member was managing another business operating on the Property. His office was located on the Property. We find FLM's claim that it was unaware of a fifty-foot-tall, 105,000-ton, two-acres-wide mountain of sand on that Property to be wholly incredible. That said, FLM's actual knowledge of Black Mountain is a material issue of fact that renders summary judgment inappropriate solely on this basis.

Focusing on FLM's actual knowledge, however, begs the question of whether actual knowledge of Black Mountain's many ordinance violations is required. FLM insists that it is, but its own cited authorities stand for a different proposition. In *City of Webster Groves v. Erickson*, 789 S.W.2d 824, 826-27 (Mo. Ct. App. 1990), the Court held that the owner of a property is subjected to vicarious liability for a tenant's zoning violation if the owner has, among other things, actual *or constructive* knowledge of the violation. And the *Webster Groves* Court cited favorably to a New York case holding that a property owner who "knowingly lets the premises for a *purpose* which *may* give rise to liability . . . will not be heard to complain, even though he has done no unlawful act." *New York v. Scott*, 258 N.E.2d 206, 209 (N.Y. 1970) (emphases added).

Here, FLM admittedly leased a portion of the Property to IRI for the sole purpose of storing sand—a purpose that may give rise to liability. FLM is charged with knowing that sand storage would implicate rules limiting height, requiring drainage permits, and forbidding alterations that do not comply with existing topography. Moreover, we again note that FLM's principal was operating another business on the very same Property, meaning that FLM cannot credibly claim that it lacked constructive notice of the massive Black Mountain.

FLM was at least constructively, if not actually, aware of the presence of the 105,000-ton mountain of sand on the Property. And Black Mountain did not just slightly exceed ordinance requirements. It is over fifty feet tall—more than

*twice* as high as that permitted by Revised Code section 733-209(a)(1)—and covers *two acres* of land.

[24] FLM argues that to impose liability under these circumstances is an improper imposition of strict liability. We cannot agree. FLM is liable only if it caused, suffered, or allowed these violations; the mere fact that it owns and leased the Property is insufficient. Here, FLM leased the Property for the sole purpose of sand storage—a purpose that may give rise to liability. And FLM's principal worked on a regular basis at that same Property. According to FLM's own authority, these circumstances establish that FLM had constructive knowledge of the presence of Black Mountain on the Property, and its failure to take action to remediate the situation means that FLM allowed the violations to occur.

## 2. 2004-Present

[25] Even if the events occurring between 1999 and 2004 did not establish that FLM allowed the violations to occur, the events from 2004 to the present certainly do. While it is true that FLM pursued IRI's insurer, FLM has now recovered at least $1.7 million—yet Black Mountain remains. We wholly agree with the City that it is "[n]onsense" that FLM's mere pursuit of the insurance proceeds establishes that it is not suffering and allowing the ongoing ordinance violations when FLM has refused to use that money to remedy the violations. Appellee's Br. p. 22.

[26] For *four years*, FLM has had $1.7 million on hand. It used a significant portion of the award to recoup its own lost rent and legal fees. It has used $0 to work

on removing the Black Mountain scourge from the Property. FLM makes the outrageous defense that it does not have sufficient funds to completely remove the sand; as a result, it argues it should be excused from doing so. We are, frankly, stunned by this argument. A lack of ability to pay does not constitute a defense to a parking ticket or virtually any civil claim we can think of, much less to a lawsuit regarding an environmental scourge contained on the defendant's own property. We decline to hold that a corporate entity may be absolved of a legal obligation simply because it is difficult to find the funds to fulfill that obligation—especially where the corporation has already reaped a nearly $2 million award for precisely that purpose.

[27] We understand that in a perfect world, FLM would find a contractor willing to take all the sand for reuse, which is the least expensive option, but this is not a perfect world, and FLM has not been able to identify such a contractor. It is left with two options: (1) removal of all the sand at once to a landfill, at a cost of $2.3 million; or (2) load-by-load removal, at a total cost of over $3.5 million. FLM has taken no steps to initiate either option. It could have slowly, over time, removed the sand in loads, at least shrinking the mountain of sand and bringing it closer to compliance with the ordinances. It has had four years of possession of $1.7 million—with another $750,000 held by the insurance litigation trial court—and *has not used a dime* to make the mountain smaller. The fact that FLM claims it has insufficient funds to remove all the sand is wholly immaterial as to whether FLM has allowed Black Mountain to continue to exist. FLM has unquestionably and undeniably allowed this environmental

hazard to remain, and it has done so for years. Under these circumstances, we find that the trial court did not err by granting summary judgment in favor of the City.

[28] As a final aside, we note that FLM argues that the City has the right to enter the Property to take appropriate action, including the removal of Black Mountain, to abate the problems caused by the sand. We find this argument to be ludicrous. FLM has obtained IRI's only known asset—the insurance proceeds. To contend that FLM should be permitted to retain those millions of dollars while saddling taxpayers with the cost of removing Black Mountain is to make an argument that does not come close to passing the proverbial straight face test. It would be unjust and unfair to require the taxpayers of Indianapolis to foot this bill, and the trial court properly refused to do so.

[29] The judgment of the trial court is affirmed and remanded to the trial court for enforcement.

Barnes, J., and Crone, J., concur.