Wendell E. COX, Appellant–Plaintiff,

v.

NORTHERN INDIANA PUBLIC SERVICE COPMANY, INC., Appellee–Defendant.

No. 43A04–0508–CV–478.

Court of Appeals of Indiana.

June 6, 2006.

John O. Feighner, Duane J. Snow, Haller & Colvin, P.C., Fort Wayne, IN, Attorneys for Appellant.

Paul A. Rake, John M. McCrum, Eichhorn & Eichhorn, Hammond, IN, Attorneys for Appellee.

## OPINION

ROBB, Judge.

Wendell Cox, a cable installer, filed a complaint against Northern Indiana Public Service Company, Inc. ("NIPSCO") for negligence in the maintenance of the overhead high voltage electric wires and transformer affixed to a utility pole. NIPSCO filed a motion for summary judgment, alleging that it had no duty to Cox and therefore was entitled to judgment as a matter of law. The trial court granted NIPSCO's motion for summary judgment and Cox now appeals. We affirm.

### Issue

Cox raises two issues for our review, which we consolidate and restate as one: whether the trial court properly determined that NIPSCO had no duty to him and granted summary judgment for NIPSCO.

### Facts and Procedural History [1]

NIPSCO is a public utility that owns power lines and poles supporting them in Kosciusko County. NIPSCO has an obligation to make its poles available to other non-conflicting users to avoid a redundancy of equipment. To that end, NIPSCO enters into pole use agreements with other utilities.

In this case, NIPSCO entered into a pole use agreement in October 1998, with Triax Midwest, LLP, now Mediacom Cable

Company, governing the terms and conditions under which Mediacom is allowed to string coaxial television ("CATV") lines on NIPSCO's poles. The agreement, in relevant part, states as follows:

> WHEREAS, [Mediacom] is a telecommunications carrier and/or operates a cable television system serving customers located in and around [NIPSCO's] service territory and desires to construct, attach and maintain pole attachments and to make such pole attachments to the poles of [NIPSCO];

> WHEREAS, [NIPSCO] is an electric and gas public utility who owns or controls poles used, in whole or in part, for any wire communications; and

> WHEREAS, [NIPSCO] is willing to permit, to the extent it is required by law to do so, the attachment of such pole attachments subject to and upon the terms, provisions and conditions contained in this Agreement;

> NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions herein contained, the parties do hereby mutually consent and agree as follows:

> I. *Definitions*

> \* \* \*

> 3. The terms "attachment" or "pole attachment," as used in this Agreement, means any attachment by a cable television system or provider of telecommunications service to a pole owned or controlled by [NIPSCO].

> 4. The term "pole," as used in this Agreement, means any pole, duct, con-

---

1. We heard oral argument in this case on May 4, 2006, in the Hammond City Council Chambers, Hammond, Indiana. We thank Hammond Mayor Thomas McDermott and the director, Kris Costa Sakaleris, and staff of the City of Hammond Legal Aid Clinic for their hospitality and the attorneys for their written and oral presentations.

duit, or right-of-way owned or controlled by [NIPSCO].

5. The terms "modify" or "modification" include, but are not limited to, rearranging existing facilities, over-lashing wires, installing a new pole, modifying an existing pole, or strengthening, guying or anchoring.

\* \* \*

7. The term "J-hook," as used in this Agreement, means an attachment screwed into a drop pole to attach a drop cable so the tension of the drop does not pull on the F connector or the tap.

8. The term "subscriber drop," as used in this Agreement (also commonly referred to as a "service drop"), means an installation that brings service to a customer's home.

\* \* \*

## II. *Scope of Agreement*

1. [NIPSCO], to the extent it may lawfully do so, but without warranty, hereby grants a revocable non-exclusive permit and a revocable non-exclusive license to [Mediacom] to make attachments to the poles of [NIPSCO] solely for the purposes of enabling [Mediacom] to operate a cable television system and/or to act as a telecommunications carrier, subject to and upon the terms, provisions and conditions contained in this Agreement.

\* \* \*

3. No use, however extended, of [NIPSCO's] poles under this Agreement shall create or vest in [Mediacom] any ownership or property rights in [NIPSCO's] poles, but [Mediacom's] rights therein shall be and remain a mere license. . . .

## III. *Applications and Permits*

1. The following provisions govern when [Mediacom] desires to either make an attachment to [NIPSCO's] poles or add to, rearrange or modify any existing attachment:

a. Except as otherwise provided in Section III, paragraph 1(e) herein, [Mediacom] shall, before making, adding to, rearranging or modifying any attachment on the poles of [NIPSCO], make an application and receive a permit therefor. . . .

\* \* \*

e. If [Mediacom] desires to (i) install a J-hook or subscriber drop; (ii) remove an existing permitted attachment and substitute like-kind plant or facilities on one of [NIPSCO's] poles; or (iii) perform routine maintenance, and if such action does not increase the load placed upon [NIPSCO's] pole or does not increase the amount of Useable Space occupied by [Mediacom's] attachment(s), [Mediacom] shall not be required to pay an application fee for such activity but shall notify [NIPSCO] of its activities within two (2) business days after taking any of the above-referenced actions by providing [NIPSCO] with (i) the pole number and location where the activity occurred; (ii) the nature of the activity; and (iii) the date of the activity by [Mediacom] by sending such information by facsimile transmission, and by sending an additional copy by U.S. Mail. . . . In addition, within five (5) business days of such activity, [Mediacom] shall send a completed copy of the Application and Permit form, illustrating which of the above-referenced activities have been undertaken by [Mediacom], by facsimile transmission and by sending an additional copy by U.S. Mail. . . .

## IV. *Construction and Maintenance of [Mediacom's] Attachments*

1. [Mediacom] shall, at its own risk and expense, make and maintain such attachments in safe condition and in thorough repair, in a manner reasonably acceptable to [NIPSCO].... During the process of making and maintaining its attachments, [Mediacom] shall not act in a manner which unreasonably conflicts with the use of [NIPSCO's] poles by [NIPSCO] or by others lawfully using such poles or interfere with the working use of facilities thereon....

2. [Mediacom's] attachments, in each and every location shall be designed, engineered, erected and maintained in accordance with the field engineering standards of [NIPSCO] now in effect, or as hereafter may be adopted; with the requirements and specifications of the National Electrical Safety Code, including any grandfather-type provisions, amendments or revisions of the Code; and in compliance with any rules, regulations or specifications now in effect or that may hereafter be issued by the Federal Energy Regulatory Commission, the Occupational Safety and Health Administration, the IURC or any other governmental body or authority having or exercising jurisdiction. [Mediacom] shall also train or confirm the training of its employees and agents regarding the safety precautions to be utilized during the installation, construction, maintenance, use or removal of any attachment on [NIPSCO's] poles and shall specifically warn or confirm that its employees and agents have been warned of the dangers of coming into contact with the electric lines of [NIPSCO], including the fact that serious bodily injury, including death, can occur as a result of any such contact.

3. Except as otherwise provided in Section III, paragraph 1(e), [Mediacom] shall notify [NIPSCO] of its construction schedule for making any attachments hereunder so that [NIPSCO] may inspect the construction in progress....

## V. *[NIPSCO's] Maintenance of Poles and Facilities*

1. Except as otherwise required by the [Pole Attachment Act, 47 U.S.C. § 224], [NIPSCO] reserves to itself, its successors and assigns, the right to maintain its poles and to operate its facilities thereon in such manner as will best enable [NIPSCO] to fulfill its own service requirements; provided, however, that [NIPSCO] shall be required to exercise reasonable care in the use and maintenance of its poles.

Appellant's Appendix at 36–45.

On January 7, 2000, Cox, who had eleven years of cable installation experience, was working as a cable television technician for Jake's Cable, which was, in turn, a contractor for Mediacom. Cox received a work order from Mediacom to install a CATV line for Prickett's Properties in Kosciusko County. Cox first hooked the CATV line onto the bare pole on the subscriber's property at 11859 North State Road 13, and then crossed to the east side of State Road 13 to attach the CATV line to NIPSCO's pole. NIPSCO's pole had both a CATV line and a transformer and high voltage overhead electric wires. Cox positioned his ladder on the opposite side of the pole from the transformer and as he was attempting to attach the line, Cox was shocked and fell to the ground. He suffered electroshock burns to his shoulders and back and exit wounds to his knees, as well as injuries related to the fall.

Cox filed a lawsuit against NIPSCO, alleging in pertinent part:

6. [NIPSCO] carelessly, negligently, and recklessly constructed and main-

tained the overhead high voltage electric wires and transformer at said utility pole so that the electrical transmission system was not properly grounded and the resulting arc caused [Cox] to suffer severe permanent injuries.

7. [NIPSCO] negligently and recklessly failed to properly insulate the high voltage wires and/or failed to properly maintain and repair the transformer so that the electrical transmission system would be properly grounded at the particular utility pole where [Cox] was installing the cable line on January 7, 2000.

Appellant's Appendix at 7. NIPSCO answered the complaint and subsequently filed a motion for summary judgment, alleging that it "had no relationship with [Cox] as a CATV installer which would impose a duty to protect him as a utility employee from its energized power lines." *Id.* at 15. In support of its motion, NIPSCO designated the pole sharing agreement, Cox's interrogatory answers and deposition, the deposition of the owner of Jake's Cable, and the deposition of Mediacom's General Manager. Cox responded that "NIPSCO's own pole sharing agreement with [Mediacom] and the designated testimony of [Mediacom's General Manager] clearly demonstrate that NIPSCO does have a duty to exercise reasonable care to provide for the safety of a foreseeable activity, i.e., work by a cable installer, on the NIPSCO pole." *Id.* at 131–32. Following a hearing,[2] the trial court granted summary judgment to NIPSCO. Cox now appeals.

### *Discussion and Decision*

### I. Summary Judgment Standard of Review

 On appeal from a grant of summary judgment, our standard of review is the same as that of the trial court. *Wilcox Mfg. Group, Inc. v. Mktg. Servs. of Indiana, Inc.,* 832 N.E.2d 559, 562 (Ind.Ct. App.2005). We stand in the shoes of the trial court and apply a *de novo* standard of review. *Id.* Our review of a summary judgment motion is limited to those materials designated to the trial court. *Robson v. Texas Eastern Corp.,* 833 N.E.2d 461, 466 (Ind.Ct.App.2005), *trans. denied;* Ind. Trial Rule 56(H). Summary judgment is appropriate only where the designated evidence shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). For summary judgment purposes, a fact is "material" if it bears on the ultimate resolution of relevant issues. *Wilcox Mfg. Group, Inc.,* 832 N.E.2d at 562. We view the pleadings and designated materials in the light most favorable to the non-moving party. *Id.* Additionally, all facts and reasonable inferences from those facts are construed in favor of the nonmoving party. *Troxel Equip. Co. v. Limberlost Bancshares,* 833 N.E.2d 36, 40 (Ind.Ct. App.2005), *trans. denied.*

 A trial court's grant of summary judgment is clothed with a presumption of validity, and the party who lost in the trial court has the burden of demonstrating that the grant of summary judgment was erroneous. *Wilcox Mfg. Group, Inc.,* 832 N.E.2d at 562. Where a trial court enters specific findings and conclusions, they offer insight into the rationale for the trial court's judgment and facilitate appellate review, but are not binding upon this court. *Troxel Equip. Co.,* 833 N.E.2d at 40. We will affirm upon any theory or basis supported by the designated materials. *Id.* When a trial court grants summary judgment, we carefully scrutinize

---

2. The transcript of this hearing was not requested.

that determination to ensure that a party was not improperly prevented from having his or her day in court. *Id.*

## II. Duty

 The crux of NIPSCO's summary judgment motion was that it owed Cox no duty. The three elements of the tort of negligence are: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff resulting from the defendant's breach. *Cox v. Stoughton Trailers, Inc.*, 837 N.E.2d 1075, 1079 (Ind.Ct.App.2005). Summary judgment must be carefully considered in negligence cases because they are particularly fact sensitive and are governed by the objective reasonable person standard—one best applied by a jury after hearing all of the evidence. *Id.* Generally, however, whether a duty exists is a question of law for the court to decide. *Id.*

 In determining whether a duty exists, we examine and balance (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns. *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind.1991). The *Webb* test, however, is inapplicable in cases where the element of duty has already been declared or otherwise articulated under a different test. *See N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 465 (Ind.2003). Our courts have long held that

> electric utilities have no duty to insulate even those lines that they own if the general public is not exposed to the lines and the utility has no knowledge of a particular segment of the population that is regularly exposed to the uninsulated lines. Stated another way, the utility company has a duty to insulate its lines in places where the general public comes into contact with them, but not where the only people who come into

contact with them are utility employees or others charged with knowledge of necessary safety precautions.

*Butler v. City of Peru,* 733 N.E.2d 912, 916–17 (Ind.2000) (citations omitted).

There are competing theories at work here: first, NIPSCO has a duty if it knows or should know that someone will be using the pole; however, there is no duty if the person using the pole knows or should know of the danger inherent in such work unless the danger comes from some malfunction of which the person would have no reason to be aware.

 Pursuant to the general rule, NIPSCO has no duty to insulate its lines if they are sufficiently isolated from the general public. *Sharp v. Town of Highland,* 665 N.E.2d 610, 616 (Ind.Ct.App.1996), *trans. denied.* One exception to that general rule is when the facts indicate that the utility has actual knowledge or notice of circumstances that create an imminent danger. *N. Ind. Pub. Serv. Co. v. E. Chicago Sanitary Dist.,* 590 N.E.2d 1067, 1074 (Ind.Ct.App.1992). Cox contends that pursuant to the pole sharing agreement with Mediacom, NIPSCO knew "that cable television repairman [sic] would be working on its poles throughout northern Indiana every day installing cable lines. . . ." Appellant's Brief at 17–18. " 'If a contract affirmatively evinces an intent to assume a duty of care, actionable negligence may be predicated upon the contractual duty.' " *Simon Prop. Group, L.P. v. Brandt Const., Inc.,* 830 N.E.2d 981, 988 (Ind.Ct.App.2005), *trans. denied* (quoting *Williams v. R.H. Marlin, Inc.,* 656 N.E.2d 1145, 1155 (Ind.Ct.App.1995)). To determine whether a party is charged with a duty of care under a contract, we look to the contract as a whole by examining all of its provisions. *Id.* The assumption of a duty creates a special relationship between the parties and a corresponding duty to act

in a reasonably prudent manner. *Hous. Auth. of City of South Bend v. Grady,* 815 N.E.2d 151, 160 (Ind.Ct.App.2004).

 Article V of the pole sharing agreement requires NIPSCO to exercise reasonable care in the use and maintenance of its poles. Article III(1)(e) of the pole sharing agreement provides that Mediacom is not required to give advance notice of installing a subscriber drop. Thus, pursuant to the pole sharing agreement, NIPSCO knew that someone acting on Mediacom's behalf could be using any one of its poles at any time. Cf. *Spudich v. N. Ind. Pub. Serv. Co.,* 745 N.E.2d 281, 291–92 (Ind.Ct.App.2001), *trans. denied* (injured city worker's once-a-year work stringing Christmas lights did not classify him as a member of a particular class of persons expected to come into regular contact with power lines; therefore, actual notice of work was required to be given to utility before utility had a duty to him). Although there is some disagreement between the parties over whether Cox was actually installing a subscriber drop or performing some other task which might have required application for a permit prior to the work, the fact remains that pursuant to the pole sharing agreement, NIPSCO agreed that Mediacom representatives would have access to its poles without advance notice to NIPSCO. Therefore, NIPSCO knew or should have known that a particular segment of the population—namely, Mediacom cable installers—is regularly exposed to its power lines.

NIPSCO acknowledges its responsibility pursuant to Article V, but points to Article IV(1), which obligates Mediacom to make its attachments at its own risk and without conflicting with the working use of the facilities on the pole, and Article IV(2), which requires Mediacom to follow applicable safety provisions of the National Electric Safety Code and the Occupational Safety and Health Administration. NIPSCO contends that pursuant to these provisions, the onus was on Mediacom and Cox to recognize the power lines as a hazard, and to ascertain the conditions of the work site and any remedial action that is required to safely perform the work. In addition to these provisions of the pole sharing agreement, NIPSCO points to *Butler,* in which our supreme court stated that an electric utility has no duty where the only people who come in contact with its power lines are "utility employees or others charged with knowledge of necessary safety precautions." 733 N.E.2d at 917. Although the pole sharing agreement imputes knowledge to NIPSCO of Mediacom's activity on and around its poles, it also requires that Mediacom send only competent people to conduct that activity. Therefore, anyone working on Mediacom's behalf should be aware of the danger inherent in working in close proximity to power lines.

Pursuant to the pole sharing agreement, NIPSCO undertook to exercise reasonable care in the use and maintenance of its poles and knew that a particular segment of the population would be regularly exposed to its power lines. However, it has no duty to those working on Mediacom's behalf for injuries caused by its power lines if the power lines were functioning normally because the cable installers should have been aware of the potential hazards of energized equipment. NIPSCO only has a duty to keep its poles and power lines from malfunctioning, a condition of which cable installers would likely be unaware. Thus, the question remains whether there was a malfunction on the pole which caused Cox's injuries.

 On several occasions throughout his brief, Cox references a defect or possible defect in NIPSCO's equipment.

*See* Appellant's Brief at 20 ("NIPSCO was on notice that CATV workers, including Cox, would be working on the pole and exposed to uninsulated transmission lines and the *risk of a defective transformer.*"); *id.* at 21 (citing *E. Chicago Sanitary Dist.*, 590 N.E.2d at 1073, which stated that "an electric utility may be liable for actual knowledge of the imminent danger caused by defects in wiring."); *id.* at 25 ("If, as happened in this case, a cable television installer suffered a life-threatening injury because of the *failure to maintain the transformer* or failure to insulate utility lines, then NIPSCO can fairly be said to have breached its duty...."). NIPSCO asserts that there is no evidence supporting a defect in its equipment. At oral argument, Cox's counsel contended that whether there was a defect or malfunction does not affect the summary judgment determination of duty, although it may be relevant at trial. We disagree. In this particular case, whether there was a malfunction determines the applicable law. If there was a malfunction, NIPSCO would have a duty to Cox; if not, NIPSCO has no duty to Cox because of Cox's own knowledge of the dangers of power lines.[3]

The only evidence regarding a possible malfunction of NIPSCO's equipment comes from Cox himself. Cox answered an interrogatory regarding the incident by stating that the "transformer arced to my right shoulder...." Appellant's Appendix at 67. However, in his deposition, when asked what direction he was looking when the incident occurred, he stated that he was looking at his hands. He was then asked how he knew the transformer arced, and he stated, "I don't know.

I did not actually see it arcing, no." *Id.* at 109. NIPSCO notes that the non-movant may not create a genuine issue of fact by contradicting his own testimony. *See King v. Ebrens*, 804 N.E.2d 821, 825 (Ind. Ct.App.2004) ("A party cannot create an issue of fact [to withstand summary judgment] by submitting an affidavit that contradicts prior deposition testimony."). As there is no other designated evidence of a defect, Cox has failed to raise a question of fact regarding NIPSCO's duty to him. The trial court properly granted summary judgment to NIPSCO.

### Conclusion

Cox is charged with knowing the potential hazards of the electrical equipment with which he came into contact in the course of his employment. Because he has failed to designate any competent evidence of a defect or malfunction in that equipment that caused his injury, NIPSCO had no duty to him even though he was a member of a particular segment of the population that NIPSCO knew would be regularly exposed to its lines. The trial court properly granted summary judgment to NIPSCO on the issue of duty.

Affirmed.

RILEY, J., and KIRSCH, J., concur.

---

**3.** We note that Cox did not plead and does not rely on the doctrine of res ipsa loquitur. Res ipsa loquitur, meaning "the thing speaks for itself," is a qualified exception to the general rule that the mere fact of injury will not create an inference of negligence. *Syfu v.* *Quinn,* 826 N.E.2d 699, 703 (Ind.Ct.App. 2005). The doctrine of res ipsa loquitur is a rule of evidence that allows an inference of negligence on the part of the defendant to be drawn from the facts and circumstances accompanying an injury. *Id.*