

**FILED**

Apr 13 2020, 8:51 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Bryan H. Babb
Bradley M. Dick
Bose McKinney & Evans LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Christopher A. Pearcy
Hume Smith Geddes Green &
Simmons, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kyle Hackney,

*Appellant-Plaintiff,*

v.

Pendu Manufacturing, Inc.,

*Appellee-Defendant.*

April 13, 2020

Court of Appeals Case No.
19A-CT-1080

Appeal from the
Lawrence Circuit Court

The Honorable
Andrea K. McCord, Judge

Trial Court Cause No.
47C01-1606-CT-595

**Kirsch, Judge.**

[1] This case involves an action by Kyle Hackney ("Hackney") against Pendu Manufacturing, Inc. ("Pendu"), alleging that a piece of machinery manufactured by Pendu contained a design defect that made it unreasonably dangerous under the Indiana Product Liability Statute. Hackney appeals the trial court's entry of summary judgment in favor of Pendu and raises several

issues, of which we find the following issue dispositive:  whether the trial court erred in granting summary judgment in favor of Pendu because the defense of misuse barred any liability by Pendu.

[2]     We affirm.

## Facts and Procedural History

[3]     On November 17, 2015, Hackney was an employee of American Fibertech ("Fibertech"), working at the Mitchell, Indiana facility that produces boards for wooden pallets.  *Appellant's App. Vol. II* at 12; *Appellant's App. Vol. III* at 46.  On that date, Hackney was working at a machine called the Pendu Edger 3000 ("the Machine"), which was manufactured by Pendu and had been delivered to Fibertech in July or August 2015.  *Appellant's App. Vol. II* at 12; *Appellant's App. Vol. IV* at 129.  The Machine trimmed edges off the boards that were cut to make four-inch and six-inch boards used to build the wooden pallets, and the Machine was comprised of three separate components:  (1) the infeed; (2) the edger itself, and (3) the custom built outfeed ("the Outfeed").  *Appellant's App. Vol. III* at 13, 49.  The Outfeed is the only component at issue in this case. *Appellant's App. Vol. IV* at 162.  The Machine was a part of Fibertech's much larger production line and fed into Fibertech's main conveyor belt.  *Id*. at 129.

[4]     The Machine was shipped by freight from Pendu to Fibertech.  *Id*. at 98-100. Pendu did not accompany the Machine to Fibertech and did not have any involvement in the installation and incorporation of the Machine and Outfeed into Fibertech's main production line.  *Id*. at 92-93.  After the Machine was

delivered, Fibertech did not contact Pendu for any reason regarding the Machine. *Id.* at 129. Included with the Machine was the Pendu Safety Manual ("the Safety Manual"), which expressly advised all operators on the safe use and operation of the Machine. *Id.* at 56; *Appellant's App. Vol. II* at 53-63. The Safety Manual was in Fibertech's possession at all relevant times, and Fibertech testified the Safety Manual was available to any and all operators of the Machine, including Hackney. *Appellant's App. Vol. IV* at 56-57.

[5] The Outfeed of the Machine was custom built and its design was based on photos provided by Fibertech of an older edger it was using and other custom requirements of Fibertech. *Appellant's App. Vol. V* at 105-06. Pendu was not told how Fibertech intended to incorporate the Outfeed into its main production line/conveyor belt. *Appellant's App. Vol. IV* at 129; *Appellant's App. Vol. V* at 125-26. Pendu was not told what the conveyor would look like or how the custom Outfeed would be incorporated. *Appellant's App. Vol. IV* at 129. It was Pendu's understanding with Fibertech that Fibertech was going to install any guarding as part of its incorporation of the Outfeed into its main production line. *Id.* at 95, 129. That understanding/agreement was established by the parties' course of dealing and memorialized by the language on their contract/change order. *Id.* at 95, 100, 129; *Appellant's App. Vol. V* at 105-06. Fibertech did all installation and configuration of the Outfeed into its production line, made several changes, and added guarding to the top of the Machine as part of its configuration. *Appellant's App. Vol. IV* at 35-42,132-33.

Pendu testified that installing a guard on the Outfeed when it manufactured the Machine for Fibertech was not feasible "[b]ecause [Pendu] didn't know exactly what [Fibertech's] belt conveyor's going to look like." *Appellant's App. Vol. V* at 101. Pendu "had no idea what [Fibertech was] putting up for guarding or how they're manufacturing" from where the Outfeed ended. *Id.* at 130. For those reasons, Pendu "built exactly what [Fibertech] wanted[,]" and Fibertech never said it wanted any guarding on the Outfeed of the Machine. *Id.* at 105-06. That was done per industry standards for custom machinery, like the Outfeed.[1]

Fibertech was "very capable of doing their own installation" of equipment and employed their own riggers and installation personnel or would retain contractors to assist them with the install or modifications. *Appellant's App. Vol. IV* at 66-67, 95. It was common for Fibertech to make modifications to the Machine after delivery. *Id.* at 96-97. Fibertech made at least the following known modifications to the Machine since delivery:

> 1. Performed or oversaw the entire installation of the Machine and incorporation into its production line;
>
> 2. Added an extensive catwalk in front of the Machine, and over its main conveyor system, stairs, and countless other modifications shown in photos, with some contractor assistance;

---

[1] ANSI industry standards 4.3 for custom machinery states that "the user shall communicate its specific safety requirements as part of the machinery purchase . . . . The supplier and user shall develop a set of specifications suited to the user's location and application specifics of the machine." *Appellant's App. Vol. IV* at 101-02.

3. Added a guard on top of the Machine that was in place at the time of Hackney's accident;

4. Added poles to the side of the Machine;

5. Removed the guards that surround the chain conveyors on the outfeed and replaced them with central chain support;

6. Altered the shaft involved in Hackney's accident by damaging it with the improper use of a pipe wrench.

*Id*. at 132-33.

[8] Hackney's normal position while working was at the rear of the Machine at the infeed area, where he would feed boards into the Machine, which would be edged or trimmed inside the Machine and then come out of the Machine via the Outfeed. *Id*. at 22. Occasionally, while performing this job, Hackney would notice scrap wood that would get caught in the Outfeed at the opposite end of the Machine, and the scrap wood would need to be removed so it would not cause a jam. *Id*. at 22-23. Both the Safety Manual and Fibertech required a person to turn off the Machine before reaching into it or servicing it in any way. *Appellant's App. Vol. II* at 53-63. On November 17, 2015, the date of the incident, Hackney was operating the Machine when he noticed a piece of scrap wood standing vertically in the Machine. *Appellant's App. Vol. IV* at 20. He then walked around to the end of the Machine to remove the piece of wood. *Id*. On his way to remove the scrap wood, Hackney walked past both the E-Stop and Main Control box, which both had buttons that would have stopped the

Machine; Hackney testified that turning off the Machine first would have "obviously" prevented his accident. *Id*. at 22-23, 28. When Hackney got to the end of the Machine, he reached his body over the still-operating Machine while balancing on one foot. *Ex. H*. Seconds later, the shirttail of Hackney's sweatshirt got caught in the Machine and became entangled until the sweatshirt was removed from Hackney's body, causing injury to Hackney's arm and shoulder. *Id*.

[9] Fibertech trained Hackney to either use the E-Stop or the lockout/tagout procedure to stop the machine before removing scrap wood from the Outfeed. *Appellant's App. Vol. IV* at 60. Fibertech taught Hackney that failure to follow the safety rules could result in serious personal injury. *Id*. at 58. Hackney stated that he was trained to turn off the machine before removing a jam, and if he had hit one of those two stop buttons that he walked past, the accident would not have happened. *Id*. at 23, 28. The Safety Manual, the safety training Hackney received twice a week and signed attendance forms for attending, and the Fibertech Safety Policy, which he signed and initialed, all required him to stop the Machine before reaching into the machine to service it, such as removing scrap wood. *Appellant's App. Vol. II* at 53-63, 95-96; *Appellant's App. Vol. IV* at 45, 81-90.

[10] Fibertech testified that the Safety Manual was available to "any and all operators" of that same machine. *Appellant's App. Vol. IV* at 56. On page two of the Safety Manual, under "Introduction," it reads: "Maintenance personnel and operators should read this manual thoroughly and become familiar with the

various assemblies and sub-assemblies.  This will be helpful when ordering replacement parts and reduce the possibility of errors." *Appellant's App. Vol. II* at 54.  On page three of the Safety Manual, it reads in all capital letters and bold font:  "**WARNING: FAILURE TO FOLLOW THESE RULES MAY RESULT IN SERIOUS PERSONAL INJURY**."  *Id*. at 55 (emphasis in original).  On the same page, it states under the heading "**SAFETY RULES FOR ALL MACHINES**":  "FOR YOUR OWN SAFETY, READ INSTRUCTION MANUAL BEFORE OPERATING THE MACHINE.  Learn the machine application and limitations as well as the specific hazards peculiar to it."  *Id*. (emphasis in original).  It further states on page three:  "WEAR PROPER APPAREL.  Loose clothing, gloves, neckties, rings, bracelets, or jewelry can get caught in moving parts."  *Id*. (emphasis in original).  On page four of the Safety Manual, it states the OSHA "Lock-Out Standard."  *Id*. at 56.  Page four also contained the following language:  "DO NOT OVERREACH.  Keep proper footing and balance at all times."  *Id*.  On page five under the heading, "**WEAR PROTECTIVE CLOTHING**," it states, "Wear close-fitting clothing and safety equipment appropriate to the job."  *Id*. at 57.  On page five, it also reads:  "Follow OSHA approved, documented lockout/tagout procedures when cleaning, servicing, adjusting, or doing any maintenance on a machine.  The lockout/tagout procedures should be permanently attached to each machine."  *Id*.  Additionally, on page seven of the Safety manual, it stated that "During operation:"

5. Follow the instructions below before performing inspections, adjustments, repairs, or removing lodged material:

a) Push the emergency stop button located on the operator's console,

b) Turn the key switch to the off position and remove the key.

c) Follow approved lockout/tagout procedures specific to the machine.

d) Be sure material feed has stopped and the arbors have stopped turning.

*Id*. at 59.

[11] Fibertech kept the "lockout/tagout" procedures attached to the Machine, and part of the new employee training at Fibertech included instruction on lockout/tagout procedures specific to the machines that an employee utilized in their job duties. *Appellant's App. Vol. III* at 59, 96-97. Employees additionally were required to attend safety meetings twice per week at Fibertech where a variety of general workplace hazards were discussed. *Appellant's App. Vol. IV* at 49-50, 53-54. Lockout/tagout procedures were listed or discussed in all of the bi-weekly safety meetings due to their "paramount" importance. *Id*. at 50-51, 81-90. On October 9, 2015, Hackney initialed and signed that he read and understood the Fibertech Safety Policy. *Appellant's App. Vol. II* at 95-96. Hackney testified in his deposition that he understood the lockout/tagout rules

and that the lockout/tagout rules would have required him to turn the Machine off prior to attempting to remove a scrap of wood. *Id*. at 192, 200, 202, 235.

[12] After Hackney's accident and injury, Fibertech investigated and determined the accident was caused by Hackney's behavior, violation of safety rules, and failure to first turn off the Machine. *Appellant's App. Vol. III* at 81-82; *Appellant's App. Vol. IV* at 72, 74-77. The report concluded that the "incident's root cause was behavioral in nature." *Appellant's App. Vol. IV* at 77. Additionally, the report concluded that Hackney was injured "when his jacket got entangled in a *shaft* at the end of the [M]achine." *Id*. (emphasis added).

[13] When the Machine was shipped from Pendu to Fibertech, the Outfeed had a smooth and machine-polished shaft. *Appellant's App. Vol. IV* at 130-31. Pendu's expert opinion stated that this would have made the shaft resistant to friction, but that the post-accident photos of the Outfeed's shaft showed that it had been damaged and was no longer smooth. *Id*. at 139-40. The expert stated that the damage to the shaft notched and serrated the shaft, enabling it "to grab [Hackney's] loose clothing." *Id*. at 141. The expert also opined that it appeared that someone had used a pipe wrench on the shaft, causing the damage. *Id*. at 122, 139-41.

[14] Hackney testified that prior to his accident he was told that another employee had lost a finger in the Outfeed of the Machine, in the same "roller" and location on the Outfeed allegedly involved in Hackney's accident. *Id*. at 31-32. For such an injury to be possible, that unknown employee would have had to

have failed to turn off the machine and put his fingers or body in or near the Outfeed. *Id.* at 141. However, Fibertech denied that anyone else had ever been injured using the Machine, and there were no workers compensation claims or other evidence to support Hackney's belief that someone else had been injured. *Id.* at 73.

On June 8, 2016, Hackney filed his complaint against Pendu, alleging that the Machine was negligently designed and that, under Indiana's Product Liability Act ("IPLA"), the Machine was unreasonably dangerous and a defective product. *Appellant's App. Vol. II* at 12-14. On June 21, 2018, Pendu filed a motion for summary judgment, arguing that Hackney's injuries were caused by Hackney's misuse of the Machine, which included failure to read the Safety Manual and failure to follow several safety warnings, that Pendu did not breach its duty to Hackney and was not the proximate cause of Hackney's injuries, and Hackney should be barred from recovery because he had prior knowledge of the Machine's danger. *Id.* at 27-42. Hackney filed his response in opposition to Pendu's motion for summary judgment, contending that summary judgment should be denied because material issues of fact existed as to whether Pendu acted negligently and whether the Machine had a design defect. *Id.* at 129-41. Pendu filed a response arguing that Hackney's accident was not caused by a design defect, the violation of safety rules and warnings by Hackney was misuse that constituted a complete defense under IPLA, alterations to the shaft of the Machine constituted a complete defense under IPLA, and Hackney's incurred

risk and knowledge of the danger of reaching into the Machine constituted a complete bar to recovery, among other things.

[16] After a hearing, the trial court issued an order granting summary judgment in favor of Pendu on February 1, 2019, and held that the "issues of misuse and alterations of the equipment as they relate to the holding in [*Campbell Hausfeld/Scott Fetzer Co. v. Johnson*], 109 N.E.3d 953 (Ind. 2018) are dispositive." *Appellant's App. Vol. V* at 153. Hackney filed a motion to correct error, which the trial court denied. Hackney now appeals.

## Discussion and Decision

[17] When reviewing the grant of summary judgment, our standard of review is the same as that of the trial court. *FLM, LLC v. Cincinnati Ins. Co.*, 973 N.E.2d 1167, 1173 (Ind. Ct. App. 2012) (citing *Wilcox Mfg. Grp., Inc. v. Mktg. Servs. of Ind., Inc.*, 832 N.E.2d 559, 562 (Ind. Ct. App. 2005)), *trans. denied*. We stand in the shoes of the trial court and apply a de novo standard of review. *Id.* (citing *Cox v. N. Ind. Pub. Serv. Co.*, 848 N.E.2d 690, 695 (Ind. Ct. App. 2006)). Our review of a summary judgment motion is limited to those materials designated to the trial court. Ind. Trial Rule 56(H); *Thornton v. Pietrzak*, 120 N.E.3d 1139, 1142 (Ind. Ct. App. 2019), *trans. denied*. Summary judgment is appropriate only where the designated evidence shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. T.R. 56(C). For summary judgment purposes, a fact is "material" if it bears on the ultimate resolution of relevant issues. *FLM*, 973 N.E.2d at 1173. We view the

pleadings and designated materials in the light most favorable to the non-moving party. *Id.* Additionally, all facts and reasonable inferences from those facts are construed in favor of the non-moving party. *Id.* (citing *Troxel Equip. Co. v. Limberlost Bancshares*, 833 N.E.2d 36, 40 (Ind. Ct. App. 2005), *trans. denied*). The initial burden is on the moving party to demonstrate the absence of any genuine issue of fact as to a determinative issue, at which point the burden shifts to the non-movant to come forward with contrary evidence showing an issue for the trier of fact. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014).

[18] A trial court's grant of summary judgment is clothed with a presumption of validity, and the party who lost in the trial court has the burden of demonstrating that the grant of summary judgment was erroneous. *Henderson v. Reid Hosp. and Healthcare Servs.*, 17 N.E.3d 311, 315 (Ind. Ct. App. 2014), *trans. denied*. We will affirm upon any theory or basis supported by the designated materials. *Id.* When a trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having his or her day in court. *Id.*

[19] Hackney's complaint claimed that the Machine was unreasonably dangerous and a defective product under the IPLA. Pursuant to the IPLA, a plaintiff must prove that a product was placed into the stream of commerce in a defective condition that was unreasonably dangerous to the user and that plaintiff's injuries were caused by this dangerous product. Ind. Code § 34-20-2-1. A product can be defective within the meaning of the IPLA because of a manufacturing flaw, a defective design, or a failure to warn of dangers while

using the product. *Cook v. Ford Motor Co.*, 913 N.E.2d 311, 319 (Ind. Ct. App. 2009), *trans. denied*. In an action based on an alleged design defect in the product or based on an alleged failure to provide adequate warnings or instructions regarding the use of the product, the party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product or in providing the warnings or instructions. Ind. Code § 34-20-2-2. To establish a prima facie case of liability under IPLA, the plaintiff must show that (1) the product is defective and unreasonably dangerous, (2) the defective condition existed at the time the product left the defendant's control, and (3) the defective condition is the proximate cause of the plaintiff's injuries. *Coffman v. PSI Energy. Inc.*, 815 N.E.2d 522, 527 (Ind. Ct. App. 2004), *trans denied*.

[20] The IPLA provides three non-exclusive defenses to a products liability action: incurred risk under Indiana Code section 34-20-6-3; misuse of the product under Indiana Code section 34-20-6-4; and modification or alteration of the product under Indiana Code section 34-20-6-5. All three statutory defenses act as a complete bar to recovery in a products liability action, but all three defenses must "be proven." *Campbell Hausfeld/Scott Fetzer Co. v. Johnson*, 109 N.E.3d 953, 959 (Ind. 2018).

[21] Here, in response to Hackney's complaint alleging that the Machine was a defective product due to an alleged design defect, Pendu filed a motion for summary judgment, arguing that, among other reasons, Hackney's injuries were caused by his misuse of the Machine, which included failure to read the

Safety Manual and failure to follow several safety warnings. After a hearing, the trial court issued an order granting summary judgment in favor of Pendu and held that the "issues of misuse and alterations of the equipment as they relate to the holding in [*Campbell Hausfeld/Scott Fetzer Co. v. Johnson*], 109 N.E.3d 953 (Ind. 2018) are dispositive." *Appellant's App. Vol. V* at 153. It further concluded, "the undisputed evidence is clear that Hackney misused the machine in multiple ways that together could not be reasonably expected by Pendu (including failing to follow lockout procedures to turn off the machine before he attempted to remove a scrap piece from the machine) and that misuse was the cause of his injuries." *Id.* at 154.

[22] Hackney contends on appeal that it was error for the trial court to grant summary judgment on the basis of the misuse defense. Specifically, he asserts that a jury should decide whether the violations of warnings and instructions alleged by Pendu even constitute violations and whether they combine in the aggregate to constitute misuse. He also argues that a jury must decide if Pendu could have reasonably expected him to reach inside an operating, unguarded Machine because the evidence supported that, since the Machine did not include guards and Pendu included a warning on the Machine that users not operate the Machine without guards, it expected an operator like Hackney to fail to follow instructions and reach into the Machine while it was operating. Hackney maintains that there is no other reason why Pendu would warn against operating the Machine without guards under any circumstances, other

than that Pendu understood that its other written warnings on how to operate the Machine might not be followed.

[23] Misuse is typically a question of fact for a jury to decide. *Campbell*, 109 N.E.3d at 959. However, summary judgment based on misuse is appropriate when the undisputed evidence proves that the plaintiff misused the product in an unforeseeable manner. *Id.* Misuse is established as a matter of law when the undisputed evidence proves that plaintiff used the product in direct contravention of the product's warnings and instructions. *Id.* The misuse defense acts as a complete bar to recovery in a products liability action but must "be proven." *Id.* "[I]n order to successfully employ misuse as a defense, the seller must show both that the misuse of the product is: 1) the cause of the harm; and 2) not reasonably expected by the seller." *Id.* at 957. Therefore, if "a plaintiff misuses a product but it is not the cause of the harm and/or the misuse can reasonably be expected by the seller, then the misuse would not serve as a complete defense and comparative fault principles would apply." *Id.* at 959.

[24] Here, the trial court granted summary judgment in favor of Pendu and held that the "issues of misuse and alterations of the equipment as they relate to the holding in [*Campbell*] . . . are dispositive." *Appellant's App. Vol. V* at 153. In *Campbell*, Johnson was seriously injured while using a hand-held grinder designed by Campbell Hausfeld. 109 N.E.3d at 954. "The [g]rinder is an approximately eight-inch, hand-held, air-powered tool intended for grinding, polishing, deburring, and smoothing sharp surfaces." *Id.* at 955. Johnson did not use the tool for any of those intended purposes and, instead, used it to help

a friend do some work on the friend's truck by "cut[ting] around the truck's headlight opening to accommodate larger headlights." *Id.* Johnson "took the [g]rinder and attached a cut-off disc to it using a mandrel. Johnson's friend expressed concern about him using the cut-off disc, which was rated lower than 25,000 RPM, but Johnson used the cut-off disc anyway." *Id.* Johnson wore his prescription glasses as he cut around the headlights with the grinder, believing they were sufficient to serve as safety glasses. *Id.* While using the grinder, the cut-off disc came apart and a piece struck him in the left side of his face, breaking his eyeglasses and causing serious injuries to his cheek and eye. *Id.*

[25] Johnson sued Campbell Hausfeld, alleging the tool was defective in its design and that the manufacturer failed to provide adequate warnings, and Campbell Hausfeld sought summary judgment, contending, among other things, that Johnson had misused the tool by failing to follow its instructions. *Id.* Specifically, Campbell Hausfeld alleged that Johnson "misused the [g]rinder in three ways [in violation of its instructions]: he did not wear proper safety glasses; he attached and used a cut-off disc without a safety guard in place; and the cut-off disc had an inadequate RPM rating." *Id.* at 959.

[26] Our Supreme Court determined that the misuse statutory defense turned on "whether Johnson's failure to follow the instructions was reasonably expected by Campbell Hausfeld." *Id.* The Court found, "while Campbell Hausfeld could have perhaps reasonably expected a user to not use proper eyewear or for a user to attach a cut-off disc without a guard, or for a user to attach something

with an improper RPM rating, it was not reasonably expected for a user to disregard the safety instructions in all three of these ways." *Id*. at 960.

[27] Here, Pendu alleges that Hackney committed multiple violations of the warnings and instructions for the Machine and misused the Machine in several ways. Specifically, Pendu asserts that: (1) Hackney failed to turn off the Machine before reaching into it; (2) Hackney overreached and did not maintain proper balance and footing when he reached into the Machine; (3) Hackney leaned over and in front of the Machine, putting his body in front of the Outfeed, which was not otherwise accessible due to the placement of the conveyor belt; (4) Hackney failed to wear proper apparel by wearing a baggy sweatshirt; (5) Hackney ignored his training about the nip points of the Machine and his belief that someone had previously lost a finger on the Machine; (6) Fibertech failed to ensure that Hackney reviewed the Safety Manual, contrary to the warnings that all operators must review it; and (7) Fibertech damaged the shaft by using a pipe wrench on it.

[28] The designated evidence showed that Hackney testified that turning off the Machine first would have "obviously" prevented his accident and that he was trained to turn off the Machine before removing a jam, and if he had hit one of those two stop buttons that he walked past on the way to remove the scrap of wood, the accident would not have happened. *Appellant's App. Vol. IV* at 22-23, 28. Evidence also showed that the Safety Manual, the safety training Hackney received twice a week and signed attendance forms for attending, and the Fibertech Safety Policy, which he signed and initialed, all required him to stop

the Machine before reaching into the machine to perform service on it, such as removing scrap wood. *Appellant's App. Vol. II* at 53-63, 95-96; *Appellant's App. Vol. IV* at 45, 81-90. The evidence further showed that, on the day of the accident, Hackney left his normal position at the infeed area of the Machine and walked to the end of the Machine where the Outfeed was located to remove the scrap wood and reached his body over the still-operating Machine while balancing on one foot. *Ex. H*. As he leaned over the moving Machine, the shirttail of Hackney's loose-fitting sweatshirt got caught in the Machine and became entangled. *Id.* After Hackney's accident and injury, Fibertech investigated and determined the accident was caused by Hackney's behavior, violation of safety rules, and failure to first turn off the Machine. *Appellant's App. Vol. III* at 81-82; *Appellant's App. Vol. IV* at 72, 74-77. The report concluded that the "incident's root cause was behavioral in nature." *Appellant's App. Vol. IV* at 77. Additionally, the report concluded that Hackney was injured "when his jacket got entangled in a *shaft* at the end of the [M]achine." *Id.* (emphasis added).

[29] The evidence therefore showed that the accident would not have occurred if, by Hackney's own admission, he had turned the Machine off before going to remove the scrap wood. Further leading to the accident was the fact that Hackney leaned over the moving Machine while not being properly balanced on two feet and allowed his sweatshirt to come in contact with the shaft of the Machine. It is clear that if Hackney had turned off the Machine, the accident would not have occurred, and even if he had not done so, the accident may

have been avoided if he did not lean directly across the moving Machine, had maintained proper footing, and was not wearing a loose-fitting shirt that easily caught in the moving shaft. Thus, Hackney's failure to follow the instructions and warnings was the cause of his injuries.

[30] We must then determine whether Hackney's failure to follow the instructions and warnings was reasonably expected by Pendu. The trial court found that "the undisputed evidence is clear that Hackney misused the [M]achine in multiple ways that together could not be reasonably expected by Pendu (including failing to follow lockout procedures to turn off the [M]achine before he attempted to remove a scrap piece from the [M]achine) and that misuse was the cause of his injuries." *Appellant's App. Vol. V* at 154. Hackney argues that because Pendu included a warning on the Machine that stated "DO NOT OPERATE WITHOUT GUARDS," *Appellant's App. Vol. II* at 137, it expected an operator like Hackney to fail to follow instructions and reach into the Machine while it was operating. He claims that there is no other reason why Pendu would include such a warning against operating the Machine without guards, other than that Pendu understood that its warnings and instructions on how to operate the Machine might not be followed.

[31] We find the present case to be similar to *Campbell*, where our Supreme Court found that Johnson's multiple failures to follow the grinder's instructions were the cause of his injuries and taken together, could not be reasonably expected by a seller. 109 N.E.3d at 960. Here, Hackney also had multiple failures to follow the Machine's warnings and instructions that were the cause of his

accident and injury. While Pendu could have perhaps reasonably expected an operator to not follow one of the warnings or instructions, it could not have reasonably expected an operator to disregard the safety warnings and instructions in all of the ways that Hackney did. Hackney could have avoided injury if he had shut the Machine off before reaching into it to remove the piece of scrap wood or if he not leaned directly in front of the moving Machine or maintained proper footing or worn proper attire that would not have gotten caught in the Machine. His multiple failures to follow the Machine's warnings and instructions were the cause of his injuries and taken together, could not be reasonably expected by Pendu. We, therefore, conclude that the trial court did not err in granting summary judgment in favor of Pendu.

[32]    Affirmed.

Vaidik, J., and Mathias, J., concur.